STATE

v.

Brian BURBINE.

No. 79–212–C.A.

Supreme Court of Rhode Island.

Sept. 9, 1982.

Reargument Denied Dec. 16, 1982.

Dennis J. Roberts II, Atty. Gen., Joel D. Landry, Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Paula Rosin, Asst. Public Defender, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a judgment of the Superior Court finding the defendant, Brian Burbine (Burbine), guilty of murder in the first degree and imposing a life sentence as required by statute. Prior to trial, Burbine sought to suppress three incriminating statements obtained from him by officers of the Providence police department. The sole thrust of this appeal relates to the denial of the motion to suppress.

On March 3, 1977, at about 7 a.m., Mary Jo Hickey (Mary) was found unconscious in a parking lot on Elmwood Avenue in Providence. She was taken to St. Joseph Hospital where she remained for a time and was

then transferred to the Rhode Island Medical Center. She was treated there until March 25, 1977, when she died from injuries to the skull and brain resulting from bludgeon wounds inflicted by a large metal pipe which had been found near the scene of the attack.

The state called two witnesses, who testified that Burbine left Rhode Island and went to their house in Maine on March 4, 1977. Nancy Jean Sanders James (Nancy) stated that Burbine stayed with her and her brother, Donald Sparks (Sparks), for approximately one month. While he was in Maine, Burbine told Nancy that he had met Mary at a downtown Providence bar on the evening of March 2. Mary had bought him some drinks and then asked for a ride to her home. Burbine further stated that on the way to her house, he pulled into a parking lot and made advances to Mary. When the advances were resisted, Burbine slapped Mary "a time or two" and threw her out of the car. "[T]hat's all he knew." He stated that this had all happened "just before he came to Maine." Burbine told substantially the same story to Sparks, except that he stated to Sparks that Mary had blood on her as a result of his striking her. Burbine also informed Sparks that the next morning he had washed the blood from the interior of his automobile.

On June 29, 1977, the Cranston police arrested three men in connection with a charge of breaking and entering. One of the trio was Burbine; the other two were Sparks and a man named DiOrio. All three suspects were transported to the Cranston police headquarters. Detective Ferranti of the Cranston police two days earlier had received information from a confidential informant that a man named "Butch" who lived at 306 New York Avenue in Providence was responsible for the killing of Mary. He noted that Burbine and DiOrio had given 306 New York Avenue as their home address. Ferranti questioned DiOrio, who stated that Burbine was the only person living at that address who was called "Butch."

Armed with this information, Detective Ferranti informed Burbine of his *Miranda* rights, and at that time Burbine would not sign the waiver-of-rights form. However, Burbine did respond that he was the only person called "Butch" who resided at 306 New York Avenue. Ferranti left Burbine in the interrogation room and spoke with DiOrio and Sparks. Both men made statements implicating Burbine in the Providence homicide. Thereupon, Ferranti contacted Captain Milton Wilson of the Providence police department at about 6 p.m. Captain Wilson, along with Lieutenant Bernard Gannon and Detective Edward Trafford, proceeded to the Cranston police station for the purpose of questioning Burbine in regard to the killing of Mary. They arrived at approximately 7 p. m. and went to the Cranston detective division where they spoke with Detective Ferranti and then questioned Sparks and DiOrio.

At about 7:45 p. m., Burbine's sister, Sheila Ray, called the office of the public defender (without her brother's knowledge) to seek assistance for her brother who had previously been represented by Richard Casparian of the Public Defender's office in respect to another matter not related to the instant reasons for police custody. In fact, Burbine had missed an appointment with Mr. Casparian the afternoon of his arrest. Barbara Hurst, an appellate attorney, received the call and attempted to contact Mr. Casparian but was unable to reach him. She then called Allegra Munson, an assistant public defender, and informed Ms. Munson of the telephone conversation with Sheila Ray.

At approximately 8:15 p. m., Ms. Munson called the Cranston police station and asked that her call be transferred to the detective division. A male voice responded with the word "Detectives." Ms. Munson identified herself and asked if Brian Burbine was being held; the person responded affirmatively. Ms. Munson explained to the person that Burbine was represented by attorney Casparian who was not available; she further stated that she would act as Burbine's legal counsel in the event that the police intended to place him in a lineup or ques-

tion him. The unidentified person told Ms. Munson that the police would not be questioning Burbine or putting him in a lineup and that they were through with him for the night. Ms. Munson was not informed that the Providence police were at the Cranston police station or that Burbine was a suspect in Mary's murder. The trial justice found as a fact that Ms. Munson did make the call, but further found that there was no collusion or conspiracy on the part of the police "to secrete [Burbine] from his attorney * * *."

Lieutenant Gannon testified that he explained the *Miranda* rights to Burbine and that Burbine waived the rights by signing a waiver-of-rights form. Thereafter, a signed confession was obtained from Burbine at approximately 10:20 p. m. on June 29. A second statement was taken at the police station at approximately 11:20 p. m. A waiver-of-rights form was executed in connection with the second statement. The Providence police obtained a third written statement from Burbine during the noon period of the following day following Burbine's presentation to the District Court on the breaking-and-entering charge.[1]

All five officers who were involved in Burbine's interrogation at the Cranston police station denied any knowledge of Ms. Munson's call. There was no evidence or finding that the Providence police detectives were aware of Ms. Munson's call.

After the third confession had been obtained, at the request of Detective Trafford, Major Leyden of the Providence police department called the Public Defender's office in order to obtain an attorney to represent Burbine in respect to a lineup. Thomas Luongo, Jr., an investigator in the office of the public defender, received the call and conveyed the information to attor-

ney Casparian who went to the Providence police station and consulted with Burbine.

At the hearing on the motion to suppress, the trial justice found that Burbine had been thoroughly advised of his right to remain silent, that anything he said would be used against him, and of his right to retained or appointed counsel. He further found that Burbine was not coerced, threatened, nor promised any benefit in return for his statements. The trial justice concluded that Burbine signed waiver-of-rights-forms on three separate occasions and that when he did so, "he knowingly, intelligently, and voluntarily waived his privilege against self-incrimination. And also his right to counsel."

The defendant contends that all three confessions should have been suppressed on the ground that they were obtained in violation of defendant's right to counsel and his privilege against self incrimination. In order to place the issues raised into sharper focus, a short historical survey of the development of the modern doctrines relating to custodial interrogation will be helpful.

During the first five decades of the twentieth century, the Supreme Court of the United States groped toward a means of striking a balance between the societal need for police interrogation and the protection of the accused from undue coercive pressures. By virtue of the differing constitutional and supervisory responsibilities of the Court in respect to the federal as opposed to state judicial systems, a dual and separate approach was adopted.

In respect to the federal system of law enforcement, the Court utilized a federal statute and later federal rules of criminal procedure in order to shorten the interrogation. *See Mallory v. United States,* 354

1. When presented to the District Court, defendant purported to plead guilty to a reduced charge of malicious damage to property. He was then sentenced to six months imprisonment to commence upon his release from the custody of the Providence police. Thereafter, the public defender moved to vacate this sentence as constitutionally infirm under standards laid down in *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), since Burbine was unrepresented by counsel. However, the sentence was appealed to the Superior Court before the motion to vacate was addressed in the District Court. On June 24, 1979, Burbine pleaded nolo to the charge in the Superior Court, with representation by legal counsel, and was sentenced to six months imprisonment concurrent with a previous sentence imposed.

U.S. 449, 452, 77 S.Ct. 1356, 1358, 1 L.Ed.2d 1479, 1482 (1957); *McNabb v. United States,* 318 U.S. 332, 343–44, 63 S.Ct. 608, 614–15, 87 L.Ed.2d 819, 825–26 (1943). It was thought by Justice Frankfurter and his colleagues that the shortening of interrogation and the requirement that a suspect be presented to a federal magistrate without "unnecessary delay" would reduce the evils of a secret interrogation process at police headquarters. It was further urged that the magistrate would warn the suspect of his right to remain silent and his right to counsel. The *McNabb-Mallory* rule did not purport to be a rule of constitutional dimension but was based upon the Court's supervisory power over the administration of federal criminal justice as well as in implementation of a federal statute in *McNabb* and, in the *Mallory* case, Rule 5(a) of the Federal Rules of Criminal Procedure. The Court did not purport to extend this rule of stringently shortened interrogation to the states.

Indeed, at that time the Court's review of state cases involving allegedly involuntary confessions was based upon a due-process "shock the conscience" test.[2] The first case which resulted in the setting aside of a state conviction wherein a coerced confession had been obtained was *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). In that case the Court found that overt brutality and torture had produced the confession. This shocked the conscience of the Court sufficiently so that the confession was held inadmissible. Other cases met with varied responses. In *Crooker v. California,* 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958), a suspect in a murder case was repeatedly interrogated during a period of approximately fourteen hours. His request for an attorney was denied. The suspect was a college graduate who had completed one year in law school. These circumstances were not sufficient to shock the conscience of the Court and it was held that due process had not been violated. In *Cicenia v. LaGay,* 357 U.S. 504, 78 S.Ct.

1297, 2 L.Ed.2d 1523 (1958), a murder suspect requested to be allowed to see his attorney while under questioning by the police. The attorney arrived at the police station while petitioner was being interrogated and was refused admittance. This suspect did not have the benefit of a college education or law school experience. Nevertheless, he failed to achieve the threshold requirement necessary to constitute a violation of due process and his conviction was upheld. In *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), the Court's conscience was shocked by the misleading of the suspect by a childhood friend who had become a policeman. The erstwhile friend suggested that his job might depend upon getting a statement from the defendant. The giving of the statement contributed to the conviction and imposition of a death sentence. In that case due process was held to have been violated. The Court's sensitivity to the shocking of conscience had become heightened by the time it considered *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), and slight pressure exerted by the chief of police who threatened to take the suspect's arthritic wife into custody if the suspect did not confess was held to be sufficient to invalidate the confession. The Court also used this case to point out that an involuntary confession was inadmissible, not because it was unlikely to be true, but because the methods used offended an underlying principle of enforcement of the criminal law—that the authorities might not by coercion prove a charge out of the accused's own mouth. The culmination of the due-process test came with *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) in which an examination of the totality of circumstances convinced the Court that a written confession had been obtained in an atmosphere of substantial coercion by state authorities.

The following year the Court decided *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489,

**2.** The "shock the conscience" test was also utilized in state search and seizure cases prior to the adoption of the exclusionary rule. *Ro-* *chin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183, 190 (1952).

12 L.Ed.2d 653 (1964) in which it selectively incorporated the privilege against self-incrimination contained in the Fifth Amendment into the due-process clause of the Fourteenth Amendment. Thus, for the first time, the privilege against self-incrimination became applicable to the states. Initially this holding did not herald any remodification of the interrogation process, since conventional wisdom at the time did not apply the privilege against self-incrimination to the police interrogation process, because the police had no legal power to compel testimony. *See* Y. Kamisar, *A Dissent from the* Miranda *Dissents: Some Comments on the "New" Fifth Amendment and the Old "Voluntariness" Test,* in Police Interrogation and Confessions 48–55 (1980).

During the same year, a feeble effort was made to control the voluntariness of confessions by the somewhat fortuitous event of a lawyer's having been previously retained in respect to the specific criminal case under examination, and under circumstances where lawyer and client were kept apart by a series of blatant deceptions.[3] *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Moreover, in that case no admonitions had been given to the accused concerning his right to remain silent or his right to assistance of counsel. Indeed, so many of the facts in *Escobedo* would have been unlikely of repetition that the precedential value of the case was extremely limited and subject to many conflicting interpretations in the various states. *See, e.g., State v. Mendes,* 99 R.I. 606, 210 A.2d 50 (1965); *State v. Dufour,* 99 R.I. 120, 206 A.2d 82 (1965); *People v. Dorado,* 62 Cal.2d 338, 398 P.2d 361, 42 Cal.Rptr. 169, *cert. denied,* 381 U.S. 937, 85 S.Ct. 1765, 14 L.Ed.2d 702 (1965); *People v. Hartgraves,* 31 Ill.2d 375, 202 N.E.2d 33 (1964), *cert. denied,* 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965); *Mefford v. State,* 235 Md. 497, 201 A.2d 824 (1964), *cert. denied,*

380 U.S. 937, 85 S.Ct. 944, 13 L.Ed.2d 825 (1965); *State v. Scanlon,* 84 N.J.Super. 427, 202 A.2d 448 (1964).

Upon this somewhat murky judicial environment, the Court's opinion in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), came as a brilliant flash of lightning illuminating the interrogational landscape in all directions, but followed by the thunderclap of criticism concerning its effects upon law enforcement. In itself, the *Miranda* decision was relatively simple and its mandate not unduly difficult in application. Essentially stripped of historical analysis and carefully developed rationale, the Supreme Court imposed a set of rules upon every police officer in the land who might seek to interrogate a person suspected of crime who had been taken into custody or whose freedom had been inhibited in a significant way. The rule required that the following admonitions be given to the suspect: (1) that he has a right to remain silent; (2) that anything which he might say can be used against him in a court of law; (3) that he has the right to the presence of an attorney; (4) that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. The Court went on to say:

> "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

This rather straightforward movement of the privilege against self-incrimination from the courtroom into the police station was greeted by intense criticism, perhaps some of it most forcefully presented by the

---

3. It is interesting to observe that the deceptive practices of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), were practically identical to the practices which were held not to constitute a violation of due process in *Cicenia v. LaGay,* 357 U.S. 504, 78

S.Ct. 1297, 2 L.Ed.2d 1523 (1958). This simply was a manifestation of the difference between the "shock the conscience" test and the application of a different evaluation under the specific guarantee of the Sixth Amendment right to counsel.

dissenting justices. A sample of such criticism may be taken from Justice White's dissenting opinion.

"In some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him to repeat his crime whenever it pleases him. As a consequence, there will not be a gain, but a loss, in human dignity. The real concern is not the unfortunate consequences of this new decision on the criminal law as an abstract, disembodied series of authoritative proscriptions, but the impact on those who rely on the public authority for protection and who without it can only engage in violent self-help with guns, knives and the help of their neighbors similarly inclined. There is, of course, a saving factor: The next victims are uncertain, unnamed and unrepresented in this case." (White, J., dissenting). 384 U.S. at 542–43, 86 S.Ct. at 1663, 16 L.Ed.2d at 763.

■ We note that the *Miranda* rules have been extended and clarified in more recent opinions, and their relationship to the right to counsel has been expanded and defined. *See, e.g., Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). The teaching of *Miranda* and its progeny discloses certain basic principles to which the Court has adhered rather consistently. First, in order to trigger the necessity for *Miranda* admonitions, the dual elements of custody plus interrogation must exist. Custody or impairment of freedom in a significant way may take place in defendant's home (*Orozco*), or in a jail not controlled by the interrogator (*Mathis*). Absent custody or impairment of freedom, focus of suspicion which was so important

in *Escobedo* is no longer of significance (*Mathiason* and *Beckwith*). No importance has been attached to the fortuitous circumstances of representation by counsel save in such cases as *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and *Brewer v. Williams, supra,* where, after the commencement of judicial proceedings and the appointment or retention of counsel, it becomes impermissible for the police to take any action either surreptitious or overt which is designed or might reasonably be expected to elicit an inculpatory response. *See also Rhode Island v. Innis, supra* (although judicial proceedings had not commenced, counsel had been requested. Consequently a *Miranda* rather than the *Massiah-Brewer* analysis was applied).

■ It seems reasonably apparent that in *Miranda* the Court placed the burden of admonition squarely upon the police. The Court further required law-enforcement officials to respect without equivocation a suspect's request for counsel or assertion of the right to remain silent.

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he

wants one before speaking to police, they must respect his decision to remain silent. " * * *

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. at 473–75, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723–24.

Nothing in the *Miranda* opinion or in succeeding cases has indicated that the right to counsel may be asserted by anyone other than the accused. The strength of *Miranda* lies in its simplicity. It was designed as a set of sharp bright-line directions which police officers could easily follow. It was not dependent on the kind of fortuitous circumstance exhibited in *Escobedo,* whose very limited application it transcends and supersedes. Even such a robust exponent of the rights of the accused as Professor Yale Kamisar points out the weak congruence between a defense lawyer's entry into the proceedings and the suspect's need for a lawyer's help:

"Whatever its symbolic value, a rule that turns on how soon a defense lawyer appears at the police station or how quickly he 'spring[s] to the telephone' hardly seems a rational way of reconciling the interests of the accused with those of society." Y. Kamisar, Brewer v. Williams, Massiah, and Miranda: *What is "Interrogation"? When Does it Matter?* in Police Interrogation and Confessions 220 (1980).

Consequently, we are of the opinion that the principles of *Miranda* place the assertion of the right to remain silent and the right to counsel upon the accused, and not upon benign third parties, whether or not they happen to be attorneys.

In essence, defendant urges us to adopt a New York rule originated in *People v. Donovan,* 13 N.Y.2d 148, 193 N.E.2d 628, 243 N.Y.S.2d 841 (1963), and further explicated in *People v. Arthur,* 22 N.Y.2d 325, 239 N.E.2d 537, 292 N.Y.S.2d 663 (1968), and *People v. Hobson,* 39 N.Y.2d 479, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976), sometimes referred to as the *Donovan-Arthur-Hobson* rule.[4] This rather sweeping rule states that:

"Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel." [Citation omitted.] *People v. Arthur,* 22 N.Y.2d at 329, 239 N.E.2d at 539, 292 N.Y.S.2d at 666.

The New York rule as interpreted in *People v. Gunner,* 15 N.Y.2d 226, 205 N.E.2d 852, 257 N.Y.S.2d 924 (1965) has been given such effect as to bar the use of an inculpatory statement made by a suspect in California after the defense lawyer telephoned the Nassau County chief of police in New York that he was representing the defendant. The principle to be derived from the New York cases is that once the police know or have been apprised of the fact that the defendant is represented by counsel or that an attorney has communicated with the police for the purpose of representing the defendant, the accused's right to counsel attaches and may not be waived in the absence of counsel. This rule extended the constitutional protections of a defendant under the New York Constitution beyond those afforded by the Federal Constitution as asserted by Chief Justice Breitel in *People v. Hobson,* 39 N.Y.2d at 483–84, 348 N.E.2d at 897–98, 384 N.Y.S.2d at 422. The rule has been rejected in *Moore v. Wolff,* 495 F.2d 35 (8th Cir. 1974); *United States v. Durham,* 475 F.2d 208 (7th Cir. 1973); *Coughlan v. United States,* 391 F.2d 371

4. It should be noted that *People v. Donovan,* 13 N.Y.2d 148, 193 N.E.2d 628, 243 N.Y.S.2d 841 (1963) was decided prior to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As was demonstrated in *Vignera v. New York,* one of the *Miranda* group of cases,

it was not part of the procedural safeguards of the law of New York at that time to admonish suspects prior to interrogation of the right to remain silent or the right to counsel. *Miranda v. Arizona,* 384 U.S. at 493–94, 86 S.Ct. at 1637–38, 16 L.Ed.2d at 734–35.

(9th Cir.), *cert. denied,* 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *State v. Marks,* 113 Ariz. 71, 546 P.2d 807 (1976); *Shouse v. State,* 231 Ga. 716, 203 S.E.2d 537 (1974); *State v. Smith,* 294 N.C. 365, 241 S.E.2d 674 (1978). Most persuasively, this view is at odds with the expressed opinion of the Supreme Court of the United States in *Brewer v. Williams, supra,* wherein the Court observed:

"The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." (Footnote omitted.) 430 U.S. at 405–06, 97 S.Ct. at 1243, 51 L.Ed.2d at 441.

This court has in the past attempted to follow in interrogation cases the mandates of the Supreme Court of the United States as we have understood them to be. *See, e.g., State v. Benton,* R.I., 413 A.2d 104 (1980); *State v. Cline,* R.I., 405 A.2d 1192 (1979); *State v. Innis,* 120 R.I. 641, 391 A.2d 1158 (1978), *vacated,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. LaRosa,* 112 R.I. 571, 313 A.2d 375 (1974).

In considering whether to depart from the standards set forth by the Supreme Court of the United States in order to give further protection under limited circumstances to an accused who has not exercised his right to remain silent or his right to counsel, we must consider the balance of interests between society's need for reasonable law enforcement as against the accused's right to remain silent and to assert his privilege against self-incrimination. We recognize that other jurisdictions have adopted the New York rule or a variation thereof. *State v. Jackson,* 303 So.2d 734 (La.1974); *Commonwealth v. McKenna,* 355 Mass. 313, 244 N.E.2d 560 (1969); *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979); *Commonwealth v. Hilliard,* 471 Pa. 318, 370 A.2d 322 (1977); *State v. Jones,* 19 Wash. App. 850, 578 P.2d 71 (1978).

We are not persuaded by those authorities that the New York rule strikes the appropriate balance. In the case at bar, as in *State v. Cline, supra,* no relationship of attorney and client existed between Ms. Munson and defendant. As in *State v. Fuentes,* R.I., 433 A.2d 184 (1981), the fact that another member of the public defender's office had represented defendant on a completely unrelated matter did not create an attorney-client relationship by virtue of Ms. Munson's unsolicited telephone call.

■ Our dissenting brethren suggest that there was an obligation on the part of the police to inform Burbine of the telephone call in order that his written and verbal waivers of his right to remain silent and the right to counsel might be knowing and intelligent. We cannot accept this suggestion. In the case at bar defendant had previously been represented by the public defender's office. The evidence is overwhelming in support of the trial justice's finding that he was admonished of the right to remain silent and of his right to retained or appointed counsel. It hardly seems conceivable that the additional information that an attorney whom he did not know had called the police station would have added significantly to the quantum of information necessary for the accused to make an informed decision as to waiver. Indeed, the additional information seems somewhat inconsequential in the light of defendant's own knowledge as supplemented by the admonitions of the police officers. The dissenting justices acknowledge, unlike the Court of Appeals of New York, that after proper warning an arrested person can voluntarily waive the right to remain silent and the right to counsel. Their sole disagreement with the admissibility of the confessions in this case lies in the failure of the Cranston police, whether through negligence or otherwise, to pass on the information concerning Ms. Munson's telephone call.[5]

---

5. Our brother Kelleher suggests that the trial justice's finding that an assistant public defender did in fact call the Cranston detective divi-

sion was incongruous with the finding that there was no conspiracy or collusion on the part of the Cranston police department to se-

We fear that if such a rule were adopted, there would be nothing to prevent or discourage the office of the public defender or other defense counsel who represent a large number of recidivistic clients from sending to the various police departments throughout the state the names of these clients, together with a request that these attorneys be notified in the event that such individuals are arrested for criminal conduct. Under such a rule, the failure of the police, whether by administrative inadequacy or otherwise, to effectuate such a notification would then be fatal to the admissibility of any statements thereafter obtained. As the crime rate increases and as organized society seems ever more impotent to deal with crime on our streets, in our neighborhoods, and in our homes, this addition to the *Miranda* requirements seems as unwise on policy grounds as it is unnecessary on constitutional grounds. Thus far, the Supreme Court of the United States has placed no such mandate upon us.

Dissenting justices in *State v. Jackson* correctly point out that both *Miranda* and *Escobedo* hold that the failure to honor the *accused's* request to consult with an attorney constituted a denial of the *accused's* right to assistance of counsel under the Sixth and Fourteenth Amendments. *See State v. Jackson,* 303 So.2d at 738 (Saunders, C. J. and Marcus, J., dissenting). To modify this right as did the Supreme Court of Louisiana so that it may be invoked by family members or any other third party who happens to be a member of the bar would badly upset the balance between the societal interests and those of the accused. The next logical step would be to ban confessions altogether on the theory that a person should not be denied his right to

counsel on the fortuitous circumstance that someone might not see fit to call the station. We are unwilling· to take the first step which would inevitably lead to the ultimate step. We consider that the paramount function of government is the security of the citizens, victims as well as those who may be accused of crime. It has been recognized that the questioning of suspects is indispensable in law enforcement. *Culombe v. Connecticut,* 367 U.S. 568, 578, 81 S.Ct. 1860, 1865, 6 L.Ed.2d 1037, 1044 (1961). Perhaps the essential purpose served by police interrogation has been most graphically set forth by Justice Jackson in his concurring opinion in *Watts v. Indiana,* 338 U.S. 49, 61–62, 69 S.Ct. 1347, 1359, 93 L.Ed. 1801, 1810 (1949):

"I suppose no one would doubt that our Constitution and Bill of Rights, grounded in revolt against the arbitrary measures of George III and in the philosophy of the French Revolution, represent the maximum restrictions upon the power of organized society over the individual that are compatible with the maintenance of organized society itself. They were so intended and should be so interpreted.

"I doubt very much if they require us to hold that the State may not take into custody and question one suspected reasonably of an unwitnessed murder. If it does, the people of this country must discipline themselves to seeing their police stand by helplessly while those suspected of murder prowl about unmolested."

We therefore strike the balance at the point required by *Miranda* and its progeny. We decline to extend it by adoption of the

crete this defendant from his attorney. He therefore considers the finding to be clearly wrong. In the light of this comment, it should be noted that the principal interrogation of defendant concerning a suspected homicide was conducted by the Providence police and not by the Cranston police. It should further be noted that the Cranston police had finished their interrogation of defendant in respect to a breaking and entering charge for which he had been arrested. Thus, the disparate activities of the

representatives of the two police departments could give rise to a reasonable inference that the unidentified member of the Cranston police department who answered the telephone may well have been talking about an entirely different charge than that concerning which the Providence police would later interrogate. Thus, the trial justice's finding was based upon a set of unusual circumstances which did not inevitably point in the direction of conspiracy or collusion.

*Donovan-Arthur-Hobson* rule or a variation thereof.[6]

■ In the case at bar the finding of the trial justice that the confessions were voluntary and made following intelligent waiver of the right to counsel and the right to remain silent was supported by ample evidence and was certainly not clearly wrong. *See State v. Fuentes, supra; State v. Amado,* R.I., 424 A.2d 1057 (1981); *State v. LaRosa, supra; State v. Leavitt,* 103 R.I. 273, 237 A.2d 309, *cert. denied,* 393 U.S. 881, 89 S.Ct. 185, 21 L.Ed.2d 155 (1968).

For the reasons stated, the appeal of the defendant is denied and dismissed, the judgment of conviction is affirmed, and the papers in the case may be remanded to the Superior Court.

MURRAY, Justice, concurring.

In concurring with the result and the rationale of my associates that no attorney-client relationship existed between the public defender and the defendant, I feel compelled to articulate further the essentials necessary to create the relationship of attorney and client between an indigent criminal defendant and a member of the Public Defender's office. In so doing, it is important that the function and the role of the Public Defender's office be placed in its historical perspective.

In 1941, the General Assembly created the Office of the Public Defender by the enactment of P.L. 1941, ch. 1007, § 1. In that enactment, section 3 provided that "[i]t shall be the duty of the public defender to represent and act as attorney for indigent defendants * * *." The creation of the Office of the Public Defender thus represented the statutory institutionalization of an earlier system which provided legal assistance to indigent defendants by court appointment of private counsel after the court had made a finding of indigency.

Section 3 of the original legislation creating the office required the Public Defender to represent indigent defendants "in those criminal cases referred to him by the superior courts." This provision, which may now be found as G.L.1956 (1981 Reenactment) § 12–15–3, provides that the Public Defender represent indigent defendants in those criminal cases referred to him by this court, the Superior Court, and the District Court. Other provisions of the General Laws empower the justices of the Family Court to request that the Public Defender represent a parent or a child involved in a delinquency or dependency hearing (G.L. 1956 [1981 Reenactment] § 14–1–31) or to represent a defendant in a criminal proceeding in that court (G.L.1956 [1981 Reenactment] § 14–1–58).

A reading of each of the above-cited statutory provisions makes it clear that the Public Defender is designated to represent a particular defendant through a referral of that defendant by a justice of one of the courts enumerated therein. Once referred to the Public Defender, a defendant must submit to the department a sworn financial statement, setting forth his or her current assets and liabilities, sources of income and the names of those persons, if any, able to support him or her or to whom he or she is entitled to look for support. The Public Defender, after referral, is entitled to represent a defendant if satisfied that the defendant is indeed indigent (G.L.1956 [1981 Reenactment] § 12–15–9). However, if the Public Defender determines that the department cannot represent a defendant or that a conflict of interest would arise in doing so, then the Public Defender seeks the advice of the referring court in determining its capacity to represent the defendant within acceptable dictates of advocacy.

---

**6.** Our brother Kelleher with his usual perceptiveness is quite correct in his observation that the thrust of the *Miranda* decision was the protection of the Fifth Amendment right against self-incrimination. In his eagerness to extend *Miranda,* however, he overlooks the fact that the privilege against self-incrimination has been consistently held to be a personal privilege and must be asserted by the person entitled thereto, and not by others on his behalf. *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974); *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

In such cases, the court may assign private counsel to represent the defendant. *See, e.g.,* Superior Court Rules of Criminal Procedure 44; District Court Rules of Criminal Procedure 44. Payment for the services of such court-appointed private counsel is ordered and approved by the court. The Public Defender, however, is paid from public funds specifically appropriated for that purpose.

Thus, an attorney-client relationship is established between the Public Defender's office and a defendant by the court's referral of the defendant to the department and a determination of the defendant's current financial eligibility for the department's services on a case-by-case basis. It does not follow, therefore, that a defendant, once having been referred by the court to the Public Defender for representation in a particular criminal case, has created for himself or herself an attorney-client relationship with the department which obtains when he or she is subsequently arrested and charged with another offense. However pro forma a court referral and an update of each defendant's eligibility may appear, the need for the fiscal accountability of the court for this aspect of justice is fundamental.

My brother Kelleher suggests in his dissenting opinion that in the light of constitutional developments set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), § 12–15–3 should be amended to provide for a different method of creation of attorney-client relationship between the Public Defender and a potential client.

For reasons set forth in the majority opinion, with which I concur, I do not believe that *Miranda* mandates such a result. However, if our colleague believes the statute should be amended as he so often has observed in prior opinions, such a request is within legislative rather than judicial discretion.

BEVILACQUA, Chief Justice, with whom KELLEHER, Justice, joins, dissenting.

The sole issue in the instant case is whether the Fifth and Fourteenth Amendments require suppression of the post arrest confession of the defendant, Brian K. Burbine. Burbine contends that he did not knowingly and intelligently waive his constitutional rights to remain silent and to the presence of counsel prior to making his inculpatory statements because the police failed to inform him of Allegra Munson's availability as counsel during the interrogation process. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

Before reaching the question of waiver, however, a threshold determination must be made whether an attorney-client relationship existed between Burbine and Ms. Munson. That such a relationship existed is clear. The record indicates that Sheila Ray, Burbine's sister, contacted the Public Defender's office on behalf of Burbine, seeking the advice and assistance of assistant public defender Richard Casparian.[7] Thereupon, a staff attorney attempted unsuccessfully to contact Casparian and subsequently contacted Allegra Munson, another assistant public defender.

At approximately 8:15 p. m., Ms. Munson telephoned the Cranston police station. Her call was transferred to the detective division and the man who picked up the receiver stated, "Detectives." Ms. Munson then said, "My name is Allegra Munson. I'm an attorney in the public defender's office. I'd like to inquire as to whether or not you are holding two people by the name of Burbine and Sparks." The man responded, "Yes. We've got them," or words to that effect. Ms. Munson then stated that Burbine was represented by Casparian and that if the police intended to put Burbine in any lineups or to question him, she would make herself available because Casparian

---

7. Richard Casparian was representing Burbine on a prior, unrelated charge. Sheila Ray told a staff attorney that because of his arrest, Bur-

bine had been unable to keep an appointment that afternoon with Casparian concerning the other charge.

was unavailable at that time. The man on the phone replied, "We're through with him for the night," and indicated that Burbine would be brought to court the following morning for arraignment on a breaking-and-entering charge. Ms. Munson was not told of the murder charge.

In *State v. Cline,* R.I., 405 A.2d 1192 (1979), we held that an attorney-client relationship arises from an agreement between the parties. We further held, however, that the agreement need not be a formal contract but may be implied by the conduct of the parties. In *Cline* an attorney was appointed to represent suspects who might be arrested over an Easter weekend on a murder charge and who requested counsel. We held that because an attorney-client relationship arises from a bilateral agreement, no such relationship existed *until* the suspect's request for counsel during in-custody interrogation because the parties had never met and probably were unaware of each other's existence prior to that time.

Contrary to *Cline,* in the instant case, an attorney-client relationship certainly was created prior to the custodial interrogation that resulted in Burbine's confession. This relationship arose by virtue of the fact that, prior to the interrogation, Burbine's sister telephoned the Public Defender's office seeking legal representation for Burbine, and, as a result of that call, Allegra Munson contacted the Cranston police station to advise Burbine.

Although Burbine was unaware that his sister had obtained counsel for him, it is well settled that a third party may retain an attorney on behalf of a suspect who is in custody. *See Commonwealth v. McKenna,* 355 Mass. 313, 244 N.E.2d 560 (1969); *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979), *cert. denied,* 446 U.S. 945, 100 S.Ct. 2175, 64

L.Ed.2d 802 (1980); *Commonwealth v. Hilliard,* 471 Pa. 318, 370 A.2d 322 (1977); *State v. Jones,* 19 Wash.App. 850, 578 P.2d 71 (1978). To hold otherwise would be to ignore the practical implications of the interrogation process. Most lawyers would agree that it is much more difficult for the person in police custody to seek counsel on his own behalf than for a family member or other third party to do so for him. Moreover, to prevent a family member or other third party from obtaining legal representation for a suspect would be tantamount to violating the suspect's Fifth Amendment right to counsel. As the court in *State v. Jackson,* 303 So.2d 734, 736 (La.1974), held under similar facts and circumstances:

> "[T]he fact that a prisoner does not know [his] family has retained an attorney for [him], does not justify governmental officials to ignore [his] constitutional right to such counsel."

That an attorney-client relationship was created in the present case is further supported by our decision in *State v. Fuentes,* R.I., 433 A.2d 184 (1981). In *Fuentes* we held that such a relationship did not arise merely because the police knew that a particular attorney had represented the defendant in the past. We indicated, however, that such a relationship would arise if the attorney made it clear to the police that the attorney was representing the defendant and that the defendant was not to be questioned outside of the attorney's presence. In the instant case, Allegra Munson certainly fulfilled these conditions. Ms. Munson not only notified the police that she was representing Burbine but she also stated that she would be available to advise Burbine in the event he was interrogated. Unquestionably, therefore, an attorney-client relationship was created prior to Burbine's confession.[8]

---

8. Even though I find that Allegra Munson represented Burbine in her capacity as private counsel, I would not find it fatal if Ms. Munson had so acted in her capacity as assistant public defender. General Laws 1956 (1981 Reenactment) § 12-15-3 imposes a duty on public defenders to represent and act as attorneys for indigent criminal defendants. Although the statute requires formal appointment of public

defenders before they may represent indigents, to insist on strict compliance with the appointment procedure in the instant case would exalt form over substance.

As the Supreme Court held in *Miranda:*
> "Denial of counsel to the indigent at the time of interrogation while allowing an attorney to those who can afford one would be no more supportable by reason or logic than the simi-

We now turn to the waiver issue. In addressing the question of waiver, the trial justice must explore the totality of the facts and circumstances surrounding the defendant's statement. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Fuentes, supra.* We will not disturb the trial justice's ruling on this issue unless our independent examination of the record of the motion to suppress, made in a light most favorable to the state, discloses that the ruling was clearly erroneous. *State v. Proulx,* R.I., 419 A.2d 835, 839 (1980); *State v. Benton,* R.I., 413 A.2d 104, 109 (1980). Based on such an examination of the record, I must find that the trial justice's ruling that Burbine knowingly and intelligently waived his Fifth and Fourteenth Amendment rights was clearly erroneous.

The record discloses that the police first interrogated Burbine concerning the death of Mary Jo Hickey shortly after Burbine had been taken to the Cranston police station on a breaking-and-entering charge. Following a tip that a man named "Butch," who lived at a certain Providence address, had killed Mary Hickey, a Cranston detective informed Burbine of his *Miranda* rights and asked Burbine if he knew of "Butch."[9] Burbine would not sign a waiver-of-rights form at that time. However, Burbine did answer that he was the only person named "Butch" living at the specified address. The interrogation then ceased.

As previously stated, at approximately 8:15 p. m., Allegra Munson telephoned the Cranston police station and spoke with a man who answered the phone in the detective division. The man informed Ms. Munson that Burbine was in custody. After identifying herself and notifying the man that she was representing Burbine, she asked the man if Burbine would be put into a lineup or questioned that evening. The

man responded that the police were through with Burbine for the evening. Ms. Munson then stated that if Burbine were to be questioned, she would make herself available as counsel.

Contrary to the representations made to Burbine's attorney, the police questioned Burbine twice that evening and once the next day concerning the death of Mary Jo Hickey. On each occasion, the police informed Burbine of his *Miranda* rights and Burbine signed a waiver-of-rights form. However, the police never informed Burbine that Allegra Munson had agreed to be available if he were questioned. During the interrogation, Burbine signed three confessions stating that he had killed the victim. The first signed confession was obtained at approximately 10:20 p. m. The second signed confession was taken at approximately 11:20 p. m. The police obtained the third signed confession at 12:30 p. m. the following day.

The trial justice found as a fact that Allegra Munson did telephone the Cranston police station and that someone responded. He also found that there was no conspiracy or collusion by the Cranston police department to secrete Burbine from his attorney.

The waiver of a constitutional right must not only be voluntary but must also be a knowing and intelligent relinquishment of a known right or privilege. The determination of a valid waiver depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466. In *Miranda* the Supreme Court reasserted these "high standards" as applicable to determinations of waiver of the privilege against self-incrimination during in-custody interrogation. *Miranda v. Arizona,* 384

lar situation at trial and on appeal struck down in *Gideon v. Wainwright,* 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799] (1963), and *Douglas v. California,* 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811] (1963)." *Miranda v. Arizona,* 384 U.S. 436, 472–73, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 722–23 (1966).

9. The detective had previously asked D'Orio, who had been arrested with Burbine on the breaking-and-entering charge, the same question. D'Orio responded that Burbine was the only person called "Butch" who lived at that address.

U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724; see *State v. Vargus,* 118 R.I. 113, 373 A.2d 150 (1977). It is well known that *Miranda* also established certain procedural safeguards that law enforcement officers. must employ prior to custodial interrogation to inform the suspect of his rights under the Fifth and Fourteenth Amendments. These safeguards are the now-familiar *Miranda* warnings that advise the suspect that he has the right to remain silent and the right to the presence of counsel.[10]

Because of the inherently coercive nature of the interrogation process, *Miranda* placed a heavy burden on the government to establish a knowing and intelligent waiver if the interrogation continues without the presence of counsel. Thus, the Court held that

"[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

*Miranda* further established that once the warnings are given, the suspect may invoke his Fifth Amendment rights at any time; and in such event, the interrogation must cease. Moreover, the court held that the prosecution may not admit into evidence any statements stemming from custodial interrogation unless it demonstrates that the warnings were given and that the suspect knowingly and intelligently waived his rights.

In the instant case, the trial justice found a valid waiver because Burbine was informed of his *Miranda* rights on three separate occasions and signed a waiver-of-rights form each time prior to making his inculpatory statements. However, as *Miranda* indicates, although strong proof of waiver, Burbine's express written statements of waiver do not necessarily establish that the waiver was knowing and intelligent. *Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724; see *North Carolina v. Butler,* 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292 (1979); *State v. Proulx,* R.I., 419 A.2d at 841.

Based on the totality of the facts and circumstances attending Burbine's inculpatory statements, I must find that Burbine did not knowingly and intelligently waive his Fifth and Fourteenth Amendment rights, specifically, his right to the presence of counsel.[11] See *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *North Carolina v. Butler,* 441 U.S. at 374–75, 99 S.Ct. at 1758, 60 L.Ed.2d at 293; *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466; *State v. Fuentes,* R.I., 433 A.2d at 191–92; *State v. Amado,* R.I., 424 A.2d 1057, 1061 (1981).

The critical factor supporting my position is that the police failed to notify Burbine of Ms. Munson's availability as his counsel during the interrogation process. Although a suspect has previously been informed of his abstract right to counsel and has waived that right, he must be informed when his counsel *actually* seeks to advise him and must knowingly and intelligently reject *such* opportunity before subsequent statements may be taken and used against him. *State v. Haynes,* 288 Or. at 70, 602 P.2d at 273. Thus, without knowledge of Ms. Munson's availability as counsel, Burbine could

---

10. The specific *Miranda* warnings are as follows. The suspect must be informed

"that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

11. The Sixth Amendment right to the assistance of counsel attaches only after the commencement of judicial proceedings against the defendant. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *State v. Fuentes,* R.I., 433 A.2d 184 (1981); *State v. Amado,* R.I., 424 A.2d 1057 (1981).

not make an informed waiver of his right to the presence of counsel. This holding is consistent with those of other jurisdictions. See *State v. Jackson,* 303 So.2d at 737; *Commonwealth v. McKenna,* 355 Mass. at 325, 244 N.E.2d at 566; *State v. Haynes,* 288 Or. at 70, 602 P.2d at 277; *Commonwealth v. Hilliard,* 471 Pa. at 322, 370 A.2d at 324; *State v. Jones,* 19 Wash.App. at 853, 578 P.2d at 73.

A brief recitation of the facts of two of the above cases will illustrate the similarity between those cases and the instant case.

In the recent Pennsylvania decision of *Commonwealth v. Hilliard, supra,* the defendant was given his *Miranda* rights prior to questioning concerning a murder charge. During this period, the defendant's wife contacted the Public Defender's office seeking representation for the defendant. When an assistant public defender arrived at the police station, the police denied him access to the defendant, asserting that the defendant had not requested counsel. The defendant subsequently made a confession. The court found that although the defendant had not requested counsel and, indeed, had waived his right to have counsel present during questioning, that waiver was invalid:

> "Appellant's failure to request counsel, when his attorney has been denied access and appellant has not been informed of his attorney's availability, cannot support a determination that he has waived his right to counsel." *Commonwealth v. Hilliard,* 471 Pa. at 322, 370 A.2d at 324.

Our neighboring state of Massachusetts reached the same result in *Commonwealth v. McKenna, supra.* In *McKenna* the defendant was arrested for murder at his home and advised of his rights. Before he was taken to the police station, he asked his aunt to contact his counsel. While the defendant was being questioned at headquarters, his counsel telephoned the police station and told the police sergeant that he represented the defendant and that the defendant should not be interrogated outside his presence. The sergeant gave evasive answers and continued questioning the defendant, who ultimately made inculpatory statements. The defendant was not informed of his counsel's availability. Although the defendant never requested counsel, the Supreme Judicial Court of Massachusetts held that whatever waiver existed prior to defense counsel's call became inoperative thereafter because the defendant "was entitled to know of his counsel's availability and, with that knowledge, to make the choice [whether to have counsel present] with intelligence and understanding * * *." *Commonwealth v. McKenna,* 335 Mass. at 324, 244 N.E.2d at 566.

In the instant case, the majority hypothesizes that knowledge of Allegra Munson's availability as his counsel would not have added significantly to the quantum of knowledge necessary for Burbine to make an informed waiver. To the contrary,

> "[t]o pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. If the attorney appears on request of one's family that fact may inspire additional confidence." *State v. Haynes,* 288 Or. at 72, 602 P.2d at 278.

Another factor supporting my finding that Burbine did not make a valid waiver is that the police effectively deprived Ms. Munson of a reasonable opportunity to consult with Burbine during questioning. In *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court established that the state must afford an attorney reasonable access to his client during interrogation and strongly disapproved of such police misconduct as existed in the instant case:

> "It 'would be highly incongruous if our system of justice permitted the district attorney, the lawyer representing the State, to extract a confession from the accused while his own lawyer seeking to speak with him, was kept from him by

the police.'" *Id.* at 487, 84 S.Ct. at 1763, 12 L.Ed.2d at 984 (quoting *People v. Donovan,* 13 N.Y.2d 148, 152, 193 N.E.2d 628, 629, 243 N.Y.S.2d 841, 843 (1963)). Jurisdictions have adhered to the reasoning of *Escobedo.* *See United States v. Springer,* 460 F.2d 1344, 1353 (7th Cir. 1972); *Coughlan v. United States,* 391 F.2d 371, 372 (9th Cir. 1968); *United States v. Wedra,* 343 F.Supp. 1183, 1185–87 (S.D.N.Y.1972); *State v. Jackson,* 303 So.2d at 737; *Commonwealth v. McKenna,* 355 Mass. at 325, 244 N.E.2d at 567; *Commonwealth v. Hilliard,* 471 Pa. at 322, 370 A.2d at 324; *State v. Jones,* 19 Wash.App. at 853–54, 578 P.2d at 72–73.

Although the trial justice found that in the present case there was no conspiracy or collusion on the part of the police to secret Burbine from his attorney, the assurance the police gave to Ms. Munson that Burbine would not be interrogated, upon which assurance she reasonably relied, was "as effective in preventing consultation as the physical barrier which confronted Escobedo's attorney at the jail house door." *United States v. Wedra,* 343 F.Supp. at 1186 (quoting *Coughlan v. United States,* 391 F.2d at 375 (Hamley, C. J., dissenting)). Moreover, in the instant case, "[t]he focus must be on the rights of the accused, not the innocence or culpability of the police." *Commonwealth v. Hilliard,* 471 Pa. at 323, 370 A.2d at 324. Thus, in view of the heavy burden the government must meet to establish a valid waiver, the police cannot claim that Burbine knowingly and intelligently waived his right to counsel when their actions effectively deprived Ms. Munson of a reasonable opportunity to advise Burbine during the interrogation. *See Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

For the foregoing reasons, I would grant the motion to suppress the signed confessions taken from Burbine. This does not mean, as the majority asserts, that I adopt the so-called New York rule, under which a suspect may never waive his Fifth Amendment rights outside his counsel's presence. *See People v. Hobson,* 39 N.Y.2d 479, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976); *People v. Donovan,* 13 N.Y.2d 148, 193 N.E.2d 628, 243 N.Y.S.2d 841 (1963). A suspect may, after being fully informed of the availability of counsel, knowingly and intelligently waive his rights without consultation with his attorney. *See Miranda v. Arizona,* 384 U.S. at 478–79, 86 S.Ct. at 1629–30, 16 L.Ed.2d at 726. However, as the Supreme Court held in *Miranda,*

> "[w]ithout the protections flowing from *adequate warnings* and the rights of counsel, 'all the careful safeguards erected around the giving of testimony [at trial], whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.'" (Emphasis added.) [Citations omitted.] *Id.* at 466, 86 S.Ct. at 1624, 16 L.Ed.2d at 719.

Under the facts and circumstances of the instant case, it is apparent that the police failed to advise Burbine properly of his *Miranda* rights. In *Miranda,* the Supreme Court underscored the necessity of the presence of counsel to eliminate "the evils in the interrogation process." As the Supreme Court held:

> "The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." *Id.* at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 721.

To allow the police to interrogate, and elicit a confession from, a suspect without informing the suspect of his counsel's availability while effectively denying his counsel reasonable access, would promote those "evils" inherent in the interrogation process which *Miranda* condemned. I cannot support a result under which the procedural safeguards carefully created by *Miranda* to protect Fifth and Fourteenth Amendment

rights would be reduced to a meaningless ritual. In view of the foregoing, I must find that the defendant, Brian Burbine, did not knowingly and intelligently waive his Fifth and Fourteenth Amendment rights to counsel.

KELLEHER, Justice, dissenting.

I fully subscribe to the sentiments expressed by the Chief Justice. However, in view of the substantial inroads made today by the majority on the fundamental right against self-incrimination, I feel compelled to offer the following comments.

At the time of his arrest during the mid-afternoon of June 29, 1977, Brian Burbine was a twenty-one-year-old fifth-grade dropout. Although he now appears before us as a convicted murderer, when he was arrested that afternoon by the Cranston police and subsequently taken to the bowels of the Cranston police headquarters where the detective bureau is located, he was entitled to the plenary protection of the constitutional guarantees against compelled self-incrimination embodied in the Fifth Amendment to the Federal Constitution and in the declaration of rights of the Rhode Island Constitution, specifically, art. I, sec. 13. The procedural safeguards delineated in the *Miranda* case were designed to effectuate such guarantees. *State v. Perez*, R.I., 422 A.2d 913, 914–15 (1980). I for one do not believe they should be so easily evaded as they were in the case at bar.

With seemingly unquestioned acceptance, my colleagues adopt the trial justice's incongruous findings that public defender Allegra Munson did in fact call the Cranston detective division and offer to be available should they wish to question Burbine but "that there was no conspiracy or collusion on the part of the Cranston Police Department to secrete this defendant from his attorney" despite the denials by all five of the officers involved in Burbine's interrogation of any knowledge of such a call. According to the testimony of these officers, Detective Ferranti and Lieutenant Ricard were the only Cranston police officers on duty in the detective division that evening. I have already alluded to the fact that the division is a self-contained unit within the department located in the basement of the Cranston station. The only other law-enforcement personnel present in this area during the critical hours of interrogation that night were Providence officers Captain Wilson, Lieutenant Gannon, and Detective Trafford.

In describing the system for routing incoming calls, the Cranston officers indicated that all such calls are first received by a main switchboard operator situated on the second floor of the building. Calls relating to a specific suspect in police custody would be relayed either to the officer on duty in charge of all department operations or to the detective division. The officer in charge of all departmental operations that evening testified that he had not received any calls regarding Burbine. He further indicated that if Ms. Munson had requested, as she testified, that her call be transferred to the detective division, it would have been routed there directly. I find it incredible on the record before us that someone other than one of the five officers who were the only persons present in the detective division, someone whom no one seems to be able to identify, could have answered Ms. Munson's call. The representations made to her that Burbine was indeed in the custody of the Cranston police but that he would not be questioned or placed in a lineup that evening, that they were "through with him for the night," and that he would be arraigned in District Court the following morning dispel any notion that the individual responding to Ms. Munson's inquiry was but an unwitting custodian of the telephone on behalf of the detective division.

This court on numerous occasions has stated that a trial justice's factual findings in matters such as were presented at the suppression hearing will be disturbed only if they are clearly wrong. Findings will be classified as clearly wrong if, after reviewing all the evidence, this court is "left with the definite and firm conviction that a mistake has been committed." *State v. Amado*, R.I., 424 A.2d 1057, 1062 (1981); *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377

(1974). The no-collusion finding, when cast in the light of all the evidence adduced at the suppression hearing, in my opinion was clearly wrong.

By its ruling today, the majority has made every police station throughout the state a potential privileged sanctuary for law-enforcement personnel in which interrogation of a suspect can proceed uninterrupted while the attorney hired by the accused's family is rendered powerless to do anything to ensure that the constitutional rights of someone's family member during such period of in-custody questioning are protected. Consequently, the police gain in their powers of interrogation[12] as the thrust of the *Miranda* safeguards go out the window, and the populace is left to wonder who responded to attorney Munson's inquiry and told her that there was no necessity to make herself available because the police were through with Burbine for the night and there would be no interrogation or lineup.

The majority's footnote 5, which attempts to eradicate any trace of collusion by suggesting the likelihood of confusion on the part of the members of the Cranston Police Department, is ingenious. However, ingenuity is no substitute for evidence. The record is devoid of any evidence to support the confusion theory. Not one of the police officers testified as to the existence of any confusion within the confines of the detective division. Rather, they were insistent that the call had never been made.

At the suppression hearing, the issue was very simple. Ms. Munson testified that her conversation with the detective division occurred at 8:15 p. m.; however, every detective who was in the division headquarters at 8:15 p. m. testified that no such call was made. The trial justice had a choice: he could have believed Ms. Munson or the police. He believed Ms. Munson and, in an effort to emulate Solomon, found no collusion, a conclusion entirely without any evidentiary support.

It is my belief that when law-enforcement authorities have failed to admit counsel to a person in custody or to inform the person of the attorney's efforts to contact him, they cannot thereafter rely upon a suspect's "waiver" for the use against him of his subsequent uncounseled statements or evidence garnered as a result of such statements. This rule protects the suspect's rights under both the Federal and State Constitutions not to testify against himself, and in the event the United States Supreme Court takes the position now espoused by the majority, I would hold that the principle cited above would still be applicable under the pertinent provisions of the declaration of rights embodied in our state's constitution.

A few observations are warranted with regard to the fears expressed by my brother Weisberger that requiring law-enforcement personnel to inform suspects in their custody of calls by attorneys hired by or contacted by the suspects' families will encourage defense counsel and public defenders to forward the names of their recidivist clients to the various police departments throughout the state with instructions that they are to be notified in the event a client previously identified is arrested. The factual situation before us is, as the Chief Justice explains in his dissent, a far cry from that depicted in the majority's hyperbole. The hypothesized onslaught of general requests by unsolicited defense counsel to be notified should an individual whose name appears among a long list of names previously submitted by counsel to the police be arrested at some uncertain date in the future is precluded by

---

12. Mr. Justice Jackson, in discussing "the right of interrogation," realized that preserving the power of interrogation presented "a real dilemma in a free society" because subjecting one without counsel to questioning presented a real peril to individual freedom whereas bringing in a lawyer impeded solution of the crime because "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Watts v. Indiana,* 338 U.S. 49, 59, 69 S.Ct. 1347, 1358, 93 L.Ed. 1801, 1808–09 (1949). The learned jurist, when he expressed those thoughts in 1949, was obviously unaware that some seventeen years later the Supreme Court with its *Miranda* pronouncements would opt to buttress the constitutional guarantee against self-incrimination.

the court's decisions in *Cline* and *Fuentes,* both *supra.* Moreover, I find it significant in this respect that the Providence police seemed to have had no difficulty in contacting and procuring the presence of Burbine's counsel when it either suited their convenience or served their purposes.

During interrogation at the Providence station the morning following his arrest and after the two confessions had been obtained at the Cranston station, an officer of the Providence police department called the Office of the Public Defender to request the presence of Burbine's counsel at a police lineup.[13] The officer and a staff member of the public defender's office testified that the call was made at about 12:05 p. m. on June 30. The third incriminating statement was obtained from Burbine that day at about 12:30 p. m. If the *Miranda* procedural safeguards are to have any meaning at all, their invocation cannot be at the discretion of the police when it is convenient for them to do so or advances their own purposes.

With all due respect to the majority, in my opinion its adherence to this unsubstantiated floodgates argument of "jailhouse lawyering" has blinded it to the harsh realities confronting an arrested suspect. Perhaps even more disturbing, the court's ruling sanctions the erection of an impenetrable wall between the arrested suspect during the critical hours of in-custody interrogation and the suspect's family, oft-times the only supporting link the suspect may have at this time to the world outside the hostile environment of the police station.

I have one final remark to make. Mrs. Justice Murray's concurrence reminds us that the Office of the Public Defender first came into existence in 1941. An examination of the pertinent Rhode Island Manual indicates that in 1941 the public defender's professional staff consisted of two individuals, the public defender and an assistant. The Rhode Island Manual for 1977 reveals that at the time of Burbine's arrest the public defender's office consisted of the public defender, seventeen assistant public defenders, a chief investigator, and six assistant investigators. The growth in this office reflects the profound changes that have occurred within the criminal-law field since the implementation of the 1966 landmark *Miranda* decision. When the Legislature first established the office and described the duty of the public defender to "act as attorney for indigent defendants" upon referral by the Superior Court, it could not have anticipated the expansion of a suspect's prearraignment, in-custody constitutional rights mandated by the United States Supreme Court in *Miranda.* The rigid and mechanistic interpretation applied to G.L. 1956 (1981 Reenactment) § 12–15–3 by my sister Murray completely ignores this development of constitutional law with respect to in-custody interrogation and the procedural safeguards crafted in *Miranda* to which *all* persons are entitled irrespective of their financial status.

Evidently, the Providence police had no difficulty accepting the public defender as Burbine's duly authorized counsel even though no referral had been made by the Superior Court relating to the homicide case when they called the Office of the Public Defender to procure the presence of counsel at a police-station lineup. I would also point out that it is highly improbable that Burbine had enjoyed a ballooning of his financial assets since his previous completion of a financial questionnaire that entitled him to representation by public defender Casparian on charges that were still pending at the time of his arrest on June 29, 1977. Moreover, it is obvious that any check on Burbine's current net worth could not have been performed that evening when public defender Munson called to provide counsel to Burbine during the critical hours of interrogation.

---

**13.** The Providence police gave conflicting versions concerning the reason an attorney was called. One officer stated that Burbine had requested an attorney. Another officer stated that Burbine did not want an attorney but the officer's supervisors insisted that Burbine have counsel present during the lineup.

Justice Murray's view, if followed to its logical conclusion, would create a dual system of justice—one for indigent persons and one for persons fortunate enough to afford private counsel. Those able to retain private counsel would be assured of the presence of their respective attorneys at the police station to serve as a buffer in the oppressive atmosphere of in-custody interrogation and to provide continuous legal advice whereas those who cannot afford private counsel would be forced to face the oppressive police-station atmosphere alone without any advice from counsel until such time as they were brought before a court for referral to the public defender's office.

Such a dual system, in my opinion, is a result never contemplated or intended by the General Assembly. General Laws 1956 (1981 Reenactment) § 12–15–9 places the responsibility of determining eligibility for the services of a public defender squarely with the Office of the Public Defender. When this provision is read in *pari materia* with § 12–15–3, there is nothing inconsistent with a preliminary determination by that office of an arrested individual's eligibility based upon the individual's oral representation of financial status or, as in this case, that of representations of a family member, so as to afford indigent persons the advice of counsel during in-custody interrogation to which they are just as much constitutionally entitled as those able to hire private counsel.

I respectfully dissent.