STATE

v.

**Ronald G. PROULX.**

No. 78–259–C.A.

Supreme Court of Rhode Island.

Sept. 19, 1980.

Dennis J. Roberts, II, Atty. Gen., Stephen R. Famiglietti, Sp. Asst. Atty. Gen., for plaintiff.

Mary E. Levesque, Paula Rosin, Janice M. Weisfeld, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

The defendant Ronald G. Proulx seeks reversal of his conviction of voluntary manslaughter entered in a Superior Court jury–waived trial. He claims that he was not arraigned "without unnecessary delay before a judge of the District Court" as required by Rule 5(a) of the Superior Court Rules of Criminal Procedure, that his conviction rests on a statement secured by the Warwick police in violation of his right to be free from compelled self–incrimination, and that the state failed to meet its burden of proof.

In 1977, ten–year–old Barbara Ann Gore lived with her mother and older brother in Cranston. On June 23 she left her home at approximately 8:30 p. m. When she failed to return, her family notified the police of her absence. The Cranston and Warwick police departments undertook an extensive search for the missing girl. On June 29, they discovered Barbara's body in a wooded area adjacent to a supermarket parking lot in Warwick. The police found a stained wooden stake broken into two pieces approximately thirty feet from Barbara's body. A serological examination disclosed that the stake was stained with human blood. An autopsy revealed that Barbara had died from an L–shaped fracture at the base of her skull.

Local television stations reported the discovery of Barbara's body on their June 29th late–evening news broadcasts. One viewer remembered that on the evening Barbara was first reported missing, he had helped start the car of a casual acquaintance, Ronald G. Proulx, in the parking lot adjacent to the wooded area where the body was discovered. He promptly communicated that

information to his father, a captain of the Warwick police department.

At nine o'clock the following morning two officers of the Warwick police department went to Proulx's home. They requested him to accompany them to Warwick police headquarters for investigative questioning. Once Proulx entered the police car, the police officers told Proulx he was suspected of murdering Barbara Gore and informed him of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[1]

At police headquarters the two police officers ushered Proulx into the office of Detective Captain Ricci. Captain Ricci orally repeated the *Miranda* warnings, Proulx then executed a form that stated the *Miranda* warnings and that stipulated: "After having been informed of my constitutional rights, I do understand these rights, and I agree to give a statement at this time * * I do not want an attorney called or appointed for me at this time." Proulx initialed each statement and signed the form. Captain Ricci and the two police officers also signed the form as witnesses.

Captain Ricci continued to question Proulx and shortly before noon, Proulx began to cry and sobbed that "[he] didn't mean to do it." He gave an oral statement that he reduced to writing around noon. According to his statement, Proulx began the evening in a club on Warwick Avenue. A friend approached him and requested him to drive an older, drunken patron to Cranston. He complied using his friend's car to accomplish the task. On his way back to the club, Proulx ran out of gas and coasted into a nearby service station. At that point, he spotted a girl walking past the service station. After he put gas in the car, he drove down Warwick Avenue and again saw the girl. He stopped the car and engaged the girl in conversation. He eventually offered her a ride, which she accepted.

Rather than take the girl directly to her destination, Proulx turned off Warwick Avenue into the supermarket parking lot. Shortly after parking the car, Proulx discovered that the girl was only ten years old. He panicked and yelled at her to get out of the car. He attempted to drive off before she had exited completely, thus causing her to fall out. Proulx stopped the car and went back to see if the girl was hurt. When he saw that she was bleeding, he picked her up and told her that he wanted to drive her to the hospital. She screamed, pulled away from him, and ran off toward the wooded area. Scared, Proulx attempted to drive away, but the car stalled. He went across the street and found a friend who helped him to start the car. He returned to the club on Warwick Avenue but stayed only a half hour before going home.

After Proulx gave that statement, one of the police officers informed Proulx formally that he was under arrest. The officer then requested Proulx to turn over the clothes that he had been wearing when Barbara Gore was injured. Proulx called his mother and arranged for her to deliver these garments to the police station. Each garment contained traces of human blood.

Although detailed, Proulx's statement did not satisfy the police officers present at his interrogation. One of the officers suggested that Proulx take a polygraph examination to prove that his statement was true. Proulx agreed and at approximately two—thirty Lieutenant Manocchia of the Cranston police department and Detective Pierce of the Warwick police department prepared Proulx for the first of three polygraph examinations. Before starting the first examination, Lieutenant Manocchia explained to Proulx a form entitled "Polygraph Request–Waiver and Release Form." The form stated that Proulx voluntarily requested the examination, repeated the *Miranda* warnings and stated that Proulx waived his rights, and provided that Proulx

---

1. In *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966), the Supreme Court mandated that an accused

   "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

released the Warwick police department, Lieutenant Manocchia, and Detective Pierce from liability that might result from the examination. Proulx indicated that he understood each component of the form and signed it in three places.

In each of the three examinations, Manocchia asked Proulx the same eight questions.[2] At the conclusion of the third examination, Manocchia informed Proulx that the polygraph demonstrated clearly that he was lying. Manocchia then commenced intensive interrogation that continued until 5 p. m. Manocchia then suggested, and Proulx agreed, that they visit the scene of Barbara Gore's death. At the scene, Proulx showed Manocchia where each of the events described in his written statement had occurred. They departed from the scene sometime after 7 p. m. At police headquarters, Manocchia and Proulx returned to the interrogation room they had occupied earlier. Shortly after their return, Proulx burst into tears. Manocchia continued to question Proulx and elicited a second statement that differed substantially from Proulx's first version of the events surrounding Barbara Gore's death.

Manocchia repeated the *Miranda* warnings before Proulx reduced the second statement to writing at approximately 9:15 p. m. According to Proulx's second statement, he offered Barbara Gore a ride because he thought he "could maybe get something off of her. (sex)." He drove her to the parking lot where he asked her if she "fool[ed] around." Barbara purportedly responded that she did not know what Proulx meant because she was only ten years old. Proulx repeated in his second statement his earlier version of the cause of Barbara's injury. In addition he stated, "I think I tried to reach for her so she wouldn't fall out and may have missed her or [maybe] hit her when I reached for her." Unable to prevent her fall, Proulx stopped the car to see if Barbara was hurt. He became scared when he observed that she was bleeding. He asked Barbara to allow him to take her to the hospital but she did not respond. Proulx panicked when he realized Barbara was badly hurt or dead, prompting him to try to carry her into the wooded area adjoining the parking lot. He could not walk on the uneven ground with Barbara in his arms, so he dragged her. Proulx closed his statement with the claim that prior to the incident he had been "drinking pretty [heavily]" and "doing 3 hits of speed (drugs)."

The state produced both statements at Proulx's trial. Defense counsel stipulated that Proulx's first statement "was taken knowingly, voluntarily, after his rights were given to him without threats, promises and coercion." Counsel moved to suppress the second statement, claiming that it was not made voluntarily. After an extensive hearing, the trial justice ruled that Proulx gave the second statement voluntarily and allowed it into evidence.

Proulx's attorney moved for judgment of acquittal of the charge of murder at the close of the state's case. The trial justice reserved decision on that motion, which action prompted the defense to rest without

2. Lieutenant Manocchia asked Proulx:
  "Q  Were you born in the United States?
   A  Yes.
   Q  Regarding whether or not you struck Barbara Gore and caused the injury resulting in her death, do you intend to answer truthfully each question about that?
   A  Yes, sir.
   Q  Do you believe that I will not ask you a question during this chart that we have not already reviewed?
   A  Yes.
   Q  Between the ages of 10 and 17, other than to your teacher and parents, do you remember lying?
   A  No.

   Q  Did you strike Barbara Gore with one or more blows that resulted in her death?
   A  No.
   Q  During the first 10 years of your life, other than to your parents, do you remember lying?
   A  No.
   Q  Did you put the body of Barbara Gore in the wooded area to the rear of the First National Store on Warwick Avenue?
   A  No.
   Q  Is there something else that you are afraid that I will ask you a question about, even though I told you I would not?
   A  No."

presenting evidence. The trial justice then considered the motion to acquit in light of the evidence presented by the state. He found that the state had failed to introduce any evidence of premeditation or malice aforethought and therefore granted the motion to acquit Proulx of murder. After ruling on the motion, the trial justice proceeded to consider Proulx's guilt of the lesser included offense of voluntary manslaughter. He found that Proulx had intentionally struck Barbara Gore's head with the wooden stake discovered near the body. He determined that the blow resulted in the skull fracture that caused Barbara's death and therefore adjudged Proulx guilty of voluntary manslaughter.

■ Proulx seeks reversal of his manslaughter conviction on three grounds. He claims first that he was prejudiced by the failure of the Warwick police to comply with the requirement of Super.R.Crim.P. 5(a) that "[a]ny person making an arrest without a warrant shall take the arrested person without unnecessary delay before a judge of the District Court * * *." We must agree, however, with the state's contention that Proulx's claim under Rule 5(a) is not properly before this court. Proulx did not raise the issue of noncompliance with Rule 5(a) in the trial court, and his failure to do so forcloses our consideration of that issue for the first time on appeal. *State v. Freitas*, R.I., 399 A.2d 1217 (1979); *State v. Haigh*, 112 R.I. 740, 315 A.2d 431 (1974).

As a second ground for reversal, Proulx asserts that the trial justice improperly admitted his second statement into evidence because the Warwick police secured it in violation of his Fifth Amendment right to be free from compelled self–incrimination. According to Proulx, the totality of circumstances surrounding his arrest and interrogation combined to deprive him of his free will and rational intellect. Proulx claims that as a result of that loss of self–direction, he was unable to make a voluntary, intelligent waiver of his Fifth Amendment rights at the time he made his second statement to the Warwick police.

■ Proulx correctly asserts that an incriminating statement made in the course of custodial interrogation cannot be admitted into evidence unless an accused waives his Fifth Amendment privilege against self–incrimination knowingly, intelligently, and voluntarily. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). If the trial justice finds that the police have informed the accused of his rights as mandated by *Miranda v. Arizona, supra*, he must explore the totality of the circumstances attending the accused's statement to determine whether the accused did legitimately waive his constitutional rights. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Benton*, R.I., 413 A.2d 104 (1980); *State v. Arpin*, R.I., 410 A.2d 1340 (1980). We shall not disturb the trial justice's ruling on the question of waiver unless an independent examination of the record of the motion to suppress, such examination made in the light most favorable to the state, discloses that the ruling was clearly erroneous. *State v. Benton, State v. Arpin*, both *supra; State v. Espinosa*, 109 R.I. 221, 283 A.2d 465 (1971).

■ Proulx contends that the trial justice's determination that he voluntarily and intelligently waived his Fifth Amendment rights was clearly erroneous. He emphasizes the length of the interrogation, the fact that he had eaten only one meal prior to making his second statement, and the fact that he was exclusively in the company of police officers from 9 a. m. until he gave his statement at 9:15 p. m. According to Proulx, the trial justice misconceived the evidence concerning the coercive, overbearing character of Manocchia's interrogation. He claims Manocchia abused the polygraph examination and "put words in his mouth" constantly. Proulx asserts that as a result he became so tired and worn down that he wrote out what he thought Manocchia wanted only to induce Manocchia to stop questioning him. According to Proulx, the contents of the second statement clearly reveal the substitution of Manocchia's will for his. He contends that each change

from the first statement reflects suggestions made by Manocchia in the course of interrogation. He points also to several words in parentheses contained in the text of the statement. Proulx claims that he did not intend or want to insert the parenthetical words. Rather, Manocchia dictated the words, and Proulx included them as instructed.

In his ruling on the question of voluntariness, the trial justice clearly considered all of the circumstances attending Proulx's second statement that were developed on the record of the motion to suppress.[3] He characterized the interrogation as lengthy and termed Manocchia's interrogation technique "vigorous." He found, however, that those circumstances were outweighed by evidence in the record demonstrating that Proulx voluntarily made his second statement to the Warwick police. In reliance on defense counsel's stipulation, the trial justice found that Proulx fully understood and voluntarily waived his Fifth Amendment privilege against self–incrimination prior to making his first statement. He then looked to Proulx's concession at the suppression hearing that the police had repeated the *Miranda* warnings several times in the course of the interrogation and that Manocchia had recited them immediately before Proulx wrote out the second statement. Proulx acknowledged that each time the warnings were repeated, he had stated to the police that he understood them. Proulx also testified that although at all times during the interrogation he had understood that the police could not force him to answer, he failed to comprehend that he could stop the interrogation at any time. The trial justice found, however, that Proulx was a "very intelligent young man" who had in fact understood the full import of the *Miranda* warnings each time he heard them.

Based on Proulx's testimony at the suppression hearing, the determination of the trial justice was that Proulx had failed to invoke any of the rights enumerated in the *Miranda* warnings. He considered that fact significant in view of his finding that Proulx fully comprehended those warnings each time they were repeated. He clearly rejected Proulx's testimony that Proulx had failed to invoke his right to remain silent only because he thought it futile.

The trial justice also referred to a tape recording of the three polygraph examinations administered by Lieutenant Manocchia. The tape included approximately one–half hour of Manocchia's interrogation of Proulx, recorded after completion of the polygraph tests. The interrogation recorded by the tape took place after the recording commenced at 2:37 p. m. and before the tape ended at approximately 3:50 p. m. Basing his decision on the tape recording, the trial justice found that Proulx was "lucid" and "well aware of what was going on." He also determined that Proulx had eaten a meal shortly after the taped interrogation had ended.

The trial justice then rejected Proulx's contention that Manocchia had in effect dictated the text of the second statement. He concluded from Proulx's testimony that Manocchia had suggested use of certain words only to clarify the meaning of Proulx's statement. He found that inclusion of those words in parentheses did not transform Proulx's voluntary statement into one in effect composed by Manocchia. In light of the totality of those circumstances, the trial justice determined that Proulx's decision to make a second statement constituted a knowing, voluntary, and intelligent waiver of Proulx's privilege against self–incrimination.

**3.** In this appeal, Proulx urges this court to consider two additional circumstances attending his second statement to the Warwick police. He claims that he was illegally arrested at his home on the morning of June 30 and detained without probable cause until he made his first statement at noon. He asserts also that the failure of the Warwick police to present him for arraignment "without unnecessary delay" constitutes a circumstance indicating the involuntary nature of his second statement. We shall not consider the effect of those additional circumstances on appeal, however, because Proulx failed to raise them at the hearing on the motion to suppress. *State v. Haigh*, 112 R.I. 740, 315 A.2d 431 (1974).

Our independent examination of the record discloses further support for the trial justice's determination. In addition to the recitation of the *Miranda* warnings, Proulx signed two separate forms that set forth the *Miranda* warnings and provided that Proulx expressly waived the enumerated rights. Although not dispositive of the question of waiver, an "express written * * * statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver * * *." *North Carolina v. Butler*, 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292. In light of the record developed at the suppression hearing, we cannot say that the trial justice was clearly erroneous in finding that Proulx had understood his constitutional rights and had waived them voluntarily to make his second statement to the Warwick police.

Finally, we turn to Proulx's contention that the state failed to adduce evidence sufficient to prove him guilty beyond a reasonable doubt of voluntary manslaughter. This court has defined voluntary manslaughter as an intentional homicide "committed under the influence of sudden passion produced by" provocation adequate to reduce the crime from murder to manslaughter. *State v. Winston*, 105 R.I. 447, 453, 252 A.2d 354, 358 (1969) (quoting from *State v. Smith*, 93 A. 1, 4, (R.I.1915)). Proulx maintains that the evidence in the record does not support the trial justice's finding that he intentionally killed Barbara Gore.

■ The findings of fact of a trial justice sitting without a jury are entitled to great weight. *State v. Nidever*, R.I., 390 A.2d 368 (1978). We shall not disturb such findings on appeal unless it appears from the record that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *State v. Sprague*, 114 R.I. 282, 331 A.2d 399 (1975).

■ Proulx asserts that we must apply the so-called Montella rule to determine whether the trial justice committed reversible error in finding that Proulx intentionally killed Barbara Gore. The "Montella" rule, derived from *State v. Montella*, 88 R.I. 469, 476, 149 A.2d 919, 922–23 (1959), provides that circumstantial evidence cannot alone sustain a finding of guilt beyond a reasonable doubt unless the trier of fact finds that the facts and circumstances of the case viewed together are not only "consistent with a hypothesis of guilt–but at the same time are inconsistent with any reasonable hypothesis of innocence." *State v. Roddy*, R.I., 401 A.2d 23, 34 (1979).[4] The evidence adduced by the state to establish Proulx's intent consisted of Proulx's statements to the Warwick police, testimony of the state medical examiner that a blow to the back of the head caused Barbara's death, and the bloodstained wooden stake discovered near Barbara's body. The absence of direct evidence of intent prompted the trial justice to apply the "Montella" rule in his finding that Proulx had intentionally killed Barbara Gore. Under the circumstances of this case, we shall also apply the "Montella" rule to determine if the trial justice erred in finding that the state sustained its burden of proving the

4. In *State v. Roddy*, R.I., 401 A.2d 23, 35 (1979), we ruled that in cases involving circumstantial evidence a jury instruction based on the "Montella" rule is no longer proper. Proulx maintains that our ruling in *Roddy* was designed solely to prevent jurors' confusion concerning the meaning and correct application of the "Montella" rule. According to Proulx, the reasonable–hypothesis–of–innocence rule remains the standard by which this court on review shall determine whether circumstantial evidence supports a finding of guilt beyond a reasonable doubt.

Proulx has misconceived the import of our ruling in *State v. Roddy*. We intended to abandon the "Montella" rule and all remaining vestiges of the distinction between circumstantial and direct evidence. *Id.* 401 A.2d at 35. We shall not revive the "Montella" rule as a standard for reviewing the sufficiency of circumstantial evidence on appeal. Rather this court shall review the sufficiency of all evidence–circumstantial as well as direct–by reference to the sole standard that it must sustain a finding of guilt beyond reasonable doubt. We shall, however, apply the "Montella" rule in this case if the evidence warrants its application because Proulx was tried and convicted prior to our ruling in *Roddy*. *State v. Sundel*, R.I., 402 A.2d 585, 590 n.4 (1979).

element of intent beyond a reasonable doubt.

■ The trial justice, basing his finding on Proulx's statement to Lieutenant Manocchia, found the following facts: Proulx picked up Barbara Gore on June 23, 1977, and drove her to the secluded spot in Warwick where her body was later discovered. After Proulx reached the secluded spot, he learned that Barbara was only ten years old and he panicked. Although not expressly stated in the record, it is clear that the trial justice inferred that Proulx's panic resulted in agitation sufficiently extreme to provoke a homicidal act.

The trial justice credited part of Proulx's statement but rejected Proulx's description of the cause of Barbara's injury. In rejecting Proulx's version of those events, the trial justice relied heavily on the testimony of the state medical examiner. The examiner testified with "reasonable certainty" that the shape and position of the fracture indicated that Barbara Gore had been struck by an object. He examined the wooden stake and stated that if wielded with adequate force, the stake could have inflicted the fatal injury. Both the state and Proulx's counsel questioned the examiner regarding the likelihood that a fall from a moving automobile caused the fracture. He described such a fall as "within the realm of a possibility." He noted that he would be "much more comfortable if there were a rock or other protruding object [where Barbara fell] to produce the injury that [he] described." On cross-examination he testified that he would expect to find blood in the area where such a fall took place but that he "could hypothesize * * * reasons why you wouldn't have blood at that particular location."

In his finding of intent, the trial justice emphasized portions of the medical examiner's testimony. He found that Barbara's fracture resulted from contact with an object rather than from a fall onto a flat road surface. He implicitly credited the examiner's testimony that he would expect to find blood in the area where such a fall had occurred, by referring to the testimony of several police officers who had searched the area surrounding Barbara's body. He found that they had "scoured" the area and that "no such rock was ever found with human blood on it." The only object stained with blood in the vicinity of Barbara's body was the wooden stake. The trial justice relied on that fact and the examiner's testimony that the stake could have inflicted the injury to infer that Proulx had in fact struck Barbara Gore with the wooden stake. Based on his finding that Proulx had panicked and on his inference that Proulx had struck Barbara with the wooden stake, the trial justice found that the state had, beyond a reasonable doubt, proved the element of intent to kill.

Proulx contends that the trial justice incorrectly applied the "Montella" rule to the circumstantial evidence adduced by the state. According to Proulx, his statement combined with the examiner's testimony established a reasonable hypothesis of his innocence of the crime of voluntary manslaughter. He claims that his statement provides a basis for finding either that Barbara accidentally fell or that he struck her while unsuccessfully attempting to prevent an accidental fall. Proulx asserts that the medical examiner's testimony that a rock on the road surface could have caused the fracture supports his hypothesis of innocence. Finally, Proulx claims that it "strains credulity" to accept the examiner's testimony that the wooden stake could have caused the fatal injury.

Proulx's asserted hypothesis of innocence overlooks an important, though implicit, finding of the trial justice. He implicitly relied on the medical examiner's testimony that the examiner would have expected to find blood in the area where the injury occurred to reject Proulx's description of the events surrounding Barbara's injury. He also impliedly determined that the object inflicting the fracture would be bloodstained. Thus he focused on the wooden stake discovered near Barbara's body because the police failed to uncover a bloodstained object consistent with Proulx's account of an accidental fall.

The only evidence in the record that conflicts with the trial justice's implicit finding that blood would be present both on the object inflicting the injury and in the area where the injury occurred is the examiner's testimony that he "could hypothesize * * reasons why" blood might not be present. We observe, however, that the examiner's testimony concerning the absence of blood was plainly speculative. Correct application of the "Montella" rule demanded only that the trial justice find that the evidence presented precluded any *reasonable* inference of innocence; it did not require him "to search out a series of speculative theories and elevate them to the status of reasonable doubt." *State v. Cole*, R.I., 394 A.2d 1344, 1347 (1978). The record supports the trial justice's implicit determination that it was unreasonably speculative to find that Barbara had suffered a bloodless injury. Both of Proulx's statements to the Warwick police indicated that Barbara bled profusely immediately after her fall from the car. Thus, we cannot fault the trial justice's finding that Proulx's statement in conjunction with the examiner's testimony did not give rise to a reasonable hypothesis of innocence in light of the absence of blood in the area where Barbara purportedly fell. Nor can we say that it was clearly erroneous to find that blood would be present on the object that had inflicted the fracture. In light of that finding, the trial justice reasonably inferred that the only blood-stained object located by the police had in fact caused Barbara's death.

■ We must also reject Proulx's contention that the examiner's opinion that the wooden stake could have inflicted the fracture "strains credulity." He does not question the examiner's qualifications to express an opinion concerning the possible causes of death. He claims instead that the trial justice should have disbelieved the examiner's testimony regarding the stake. As trier of fact, the trial justice was free to accord the probative force he deemed proper to the examiner's expert testimony. *See State v. Verdone*, 114 R.I. 613, 337 A.2d 804 (1975); *State v. Vaccaro*, 111 R.I. 59, 298 A.2d 788 (1973). The weight that the trial justice has attributed to properly admitted evidence is not a subject for appellate review. *State v. Nidever, supra.*

Based on the foregoing facts and circumstances, the conclusion of the trial justice was to reject as unreasonable Proulx's asserted hypothesis of innocence. He found the evidence adduced at trial sufficient to convince him beyond a reasonable doubt that Proulx intentionally inflicted the injury that resulted in Barbara Gore's death. In light of the record, we cannot say that the trial justice was clearly wrong in finding that the evidence presented at trial precluded any reasonable hypothesis of innocence.

We therefore deny and dismiss the defendant's appeal and affirm the judgment of conviction.

DORIS, J., did not participate.