### STATE

v.

### Nancy A. PLUNKETT.

### No. 84–219–C.A.

Supreme Court of Rhode Island.

Aug. 21, 1985.

---

Arlene Violet, Atty. Gen., Timothy Conlon, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Janice M. Weisfeld, Asst. Public Defender, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a judgment of conviction entered in the Superior Court in the county of Washington upon an information that charged the defendant with embezzlement from the town of Richmond in violation of G.L. 1956 (1969 Reenactment) § 11–41–3.[1] We vacate the conviction and remand for a new trial. The facts of the case are as follows.

1. The compilation in effect at the present time is the 1981 Reenactment. However, the statute is

The defendant became the tax collector for the town of Richmond in January 1975. During her first year in office, defendant provided regular reports to the town treasurer. Checks that equaled the amount of the taxes collected in each instance accompanied the reports.

The defendant had not been formally trained for the position and was free to establish her own accounting system. The job of tax collector was part-time and was compensated by a stipend of $1,600 per year.

It was apparently defendant's practice to give a receipt to each taxpayer and then to post the amount paid in a cash ledger. Thereafter, the amount was entered on the tax roll together with a notice of the date of payment. The sums collected were periodically remitted to the town treasurer by checks.

Carol S. Pearson, the town treasurer, testified that during the first year timely reports and remittances were received. Thereafter, the reports became irregular. Apparently, the amount of money entered on the ledger matched the amounts deposited in the bank and turned over by check from defendant to the town treasurer. The defendant left the office of tax collector in June 1978. Her successor, Carol Mooty, testified that defendant's records were scattered all over the place. Some were on scratch pads and some were on the backs of envelopes. There was further testimony that defendant accepted payments from taxpayers in her kitchen and in line at the supermarket, and at times payments were made to defendant's predecessor tax collector for delivery to defendant. There was also testimony that persons other than defendant had access to her office in the town hall.

Leo R. Lebeuf (Lebeuf), a representative of the State Bureau of Audits, began auditing the tax collector's accounts in April 1978. He determined that all of the money

identical with that which was in effect at the time of the alleged criminal offense.

that was recorded on the daily ledger sheets was in accord with the bank deposits that had been made. All the checks that defendant had written while tax collector equaled the amount of taxes deposited into the bank account.

After noting that these sums were in balance, Lebeuf began to send out confirmation slips to 1,300 taxpayers who appeared from the records to be in arrears. Payments were found to have been recorded for all but 100 of this group. The unrecorded payments for these 100 taxpayers represented money that had never been deposited into the tax collector's checking account and therefore was never paid over to the treasurer. The total amount of money missing was $29,846.19. This sum was offset by a $3,600 "surplus" that was in the tax collector's account but could not be allocated to a particular taxpayer. Consequently, compared to a total of $2,879,-141.63 that had been turned over to the town treasurer during the period affected by defendant's term of office, the sum of approximately $26,200 was unaccounted for and apparently not transmitted.

There was no direct evidence that defendant converted moneys to her own use. It was not established that she comingled any moneys with her own funds. The state's case was based upon the drawing of an inference that the money missing and unaccounted for had been misappropriated by defendant and converted to her own use. Counsel for the defense attempted to show by cross-examination that either the sums of money for which no accounting could be made were lost by means of sloppy practices or these sums might have been removed by someone else from her office.

The sole issue raised by defendant in support of her appeal is that she was limited in her cross-examination unduly and was therefore inhibited from exploring with the state's witnesses certain matters that might legitimately be raised in her defense. We are of the opinion that at least in one instance the trial justice did improperly and prejudicially limit such cross-examination.

■ Lebeuf, the auditor, had advanced the theory of "lapping" as an explanation for the unaccounted shortage of funds. This theory was based upon the hypothesis that tomorrow's funds are "used * * * to pay for today's funds." Lebeuf explained this process as follows.

"Q. What is lapping, sir?

"A. The term 'lapping' is basically an accounting term, stating that you used tomorrow's funds to pay for today's funds. What you would do is if someone were to come in and give me money, I would hold that money and hold it to one side, or whatever, okay? I would not record the receipts. And then when someone else came in, say tomorrow, with about the same amount of money, I would take their money and credit it to your account. It would involve taking money from one person and giving it—giving credit to another person, and then keeping the first person's money to one side.

"Q. Sir, did you find evidence of lapping when you were doing your audit of the tax collector's office?

"A. There were many occasions where taxpayers came in with dates signed on their copies, of one date, and the town's records would not record the money until three weeks later. That was the main reason why we went from a month prior, when a taxpayer came in with no recording of his monies coming in. We went a month prior to his date and a month after his date."

Counsel for defendant, in an attempt to rebut the inference of intentional misappropriation of funds, sought to question Lebeuf concerning the possibility of a good-faith mistake's having produced this discrepancy. He attempted to embark upon a line of questioning concerning the procedures followed by defendant in her capacity as tax collector. In response to an objection, the court asked counsel about the relevance of this line of questioning. He responded as follows:

"COUNSEL: I'll explain right now. If the town hired a person, without giving that person procedures, without giving that person guidelines, and without requiring any special expertise on the person they hire as tax collector, and if that person is doing the best job they could on their own, with their own set of procedures, made mistakes; then does that go to the heart of some sort of fraud here, or—

"THE COURT: It depends on what happened to the money and if there was money that was coming in, and if money was unaccounted for; and that's the issue before this Court. It's not a question of the procedure that was used; but if the procedure hid the money somewhere, then I'll permit you to inquire into it.

"COUNSEL: Absolutely, Your Honor, except that—

"THE COURT: I want to be guaranteed you're going to be able to show this through this witness.

"COUNSEL: Well, I don't know what I'm going to show through this witness.

"THE COURT: Then the objection is sustained at this point. You may call him as your own witness, and you may interview him as your own witness. But if you're on a fishing expedition in order to find out something in order to prove something, I'm not going to permit you to do it through cross-examination. You may examine on that area that was brought out on direct examination."

We are of the opinion that the trial justice was in error in requiring a guarantee in the form of an offer of proof as a condition precedent to allowing counsel to cross-examine in an area that appeared to be highly relevant to the issues in the case. This principle is controlled by our holding in *State v. DeBarros*, —— R.I. ——, 441 A.2d 549 (1982). In that case, although we recognized that the scope of cross-examination is within the discretion of the trial justice, we pointed out that there were certain limits upon that discretion.

"However, the state misconceives the fundamental right to cross-examine guaranteed by the Sixth Amendment to the Constitution of the United States and art. I, sec. 10, of the Rhode Island Constitution as well as the manner in which the right may be invoked. In *Alford v. United States*, 282 U.S. 687, 691–92, 51 S.Ct. 218, 219, 75 L.Ed. 624, 627–28 (1931), the Court observed:

'Cross-examination of a witness is a matter of right. *The Ottawa*, [70 U.S.] 3 Wall. 268, 271 [18 L.Ed.165][.] Its permissible purposes, among others, are that the witness may be identified with his community * * * and that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased.

'Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. [Citations omitted.]'

"We too have pointed out in *Calci v. Brown*, 95 R.I. 216, 220, 186 A.2d 234, 236 (1962) that a trial court may not properly require offers of proof with respect to inquiries made during cross-examination except in unusual and peculiar circumstances." *DeBarros*, —— R.I. at ——, 441 A.2d at 551.

■ In the case at bar, counsel for defendant could scarcely guarantee the replies that he might receive to his questions. This uncertainty in no way diminished his right to ask questions that were susceptible of relevant replies. As indicated in *DeBarros*, both the Supreme Court of the United States and this court have pointed out that counsel cannot know in advance

what pertinent facts may be elicited on cross-examination. Therefore, demanding an offer of proof is not an appropriate condition precedent to allowing a line of questions to be pursued.

Further, in the case at bar, there can be no question of the prejudicial effect of the inhibition of this cross-examination. The evidence of embezzlement was circumstantial and based upon unaccounted funds. It was most appropriate by way of defense to this charge to attempt to show, whether successfully or not, that the missing funds might be accounted for by sloppy practices or even by others' wrongdoing. The defendant should not have been prevented from pursuing this line of cross-examination.

For the reasons stated, the appeal of the defendant is sustained in part. The judgment of conviction is vacated. The case may be remanded to the Superior Court for a new trial.

The Chief Justice participated in the oral argument and in the decision of the court, but he did not participate in the publication of the formal opinion.