STATE

v.

Alfred M. WHITE.

No. 84–498–C.A.

Supreme Court of Rhode Island.

July 31, 1986.

Arlene Violet, Atty. Gen., Annie Goldberg and Thomas Dickinson. Sp. Asst. Attys. Gen., for plaintiff.

William F. Reilly, Public Defender, Paula Rosin and Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

The defendant, Alfred M. White, stands convicted of second-degree murder after a trial by jury.[1] After denying the defendant's motion for a new trial, the trial justice sentenced White to fifty years at the Adult Correctional Institutions, of which ten years were suspended, and he imposed a probationary term of ten years. The defendant is now before us on appeal from the judgment of conviction. We affirm.

At approximately midnight on March 8, 1983, Alfred White entered Buck's Lounge, a country-and-western nightclub located in Cranston, Rhode Island, walked up to Max Walters, and shot him in the head at point-blank range with a single-shot .12–gauge shotgun.

The events occurring on the night of March 7, 1983, are all the more tragic when viewed with the benefit of hindsight, always twenty-twenty in accuracy, because a racial incident provided the catalyst that set those events in motion. At about 10 p.m. on March 7, 1983, White had gone to the bar with his girl friend, Carolyn

---

1. White was acquitted of the charge of assault with a dangerous weapon against Allen Gagliastre, a bystander who was injured in the same incident. A previous trial on these charges ended in a mistrial because the jury was unable to reach verdicts on each of the counts, with the exception of the guilty verdict on the charge of possession of a loaded shotgun in a motor vehicle while upon a public highway. White received a five-year sentence on that count.

Manfredi. Alfred White is black, and Manfredi is white. He had only been to the bar on one other occasion and had not been with Manfredi at the time. Their appearance as a couple was evidently very unsettling for some of the regulars at the bar, one of whom was the victim, Max Walters.

Sheila Hemelgarn is Carolyn Manfredi's sister, and the two were not on speaking terms at that time. According to Hemelgarn's eyewitness testimony, the couple was at a table having a drink when Walters and another man, both of whom were white, approached the table. An argument began about the propriety of a black man and a white woman socializing together at the bar, and the word "nigger" was tossed about quite freely. White left the bar followed by the two men and, soon after, by a third white man. At that time, Hemelgarn got up to dance and could see through the window into the parking lot. There she saw two men chasing her sister, Carolyn. She watched Carolyn get into White's car and saw her drive away. At that moment Hemelgarn lost sight of the scene in the parking lot because she had to turn away to stay in step with the other dancers doing the hully gully. She testified that about forty-five minutes to an hour later, White came back into the bar carrying a shotgun. He walked up to Max Walters and shot him. Allen Gagliastre, the bar owner, who was standing near the victim, was injured when pellets from the shotgun blast hit him in the face.

After shooting the victim, White left the bar and drove away. He was arrested a short while later by the Providence police on suspicion of murder, and a single-shot .12–gauge shotgun with a spent shell still in the chamber was found in the car. An unused shell was found in White's pocket. During the early-morning hours of the same day, after having been advised of his rights, White gave three separate statements to the Cranston police, confessing that he had killed Walters.

Jay Barry Robinson testified that prior to the shooting, Walters had spoken to him about a "nigger and a white broad together." Walters said that he had "punched out" White.

Doctor Loren Mednick, who performed the autopsy on Walters, testified that Walters had died of blood loss from several blood vessels severed in the shooting. Doctor Mednick also testified that Walters' blood-alcohol level indicated that he was intoxicated at the time of the shooting.

White's three statements to the Cranston police were admitted into evidence over his objection. The first statement was an oral confession given to Cranston police officer Vincent McAteer in the police cruiser as White was being transferred from Providence police headquarters to Cranston. The second was a tape-recorded statement, and the third was a written statement, both of which were given at the Cranston police station. In his confessions, White described what happened on the night of the murder.

"Me and my girl friend were sitting having a drink and this guy pointed over to me and told me, 'hey, you nigger, I'm talking to you, get up, get out, get out the door.' And as I went to get up he grabbed me and threw me toward the door and he grabbed me again and threw me out of the door. He punched me and started calling me nigger and kicked me. Another guy was with him, but the other guy didn't hit me or nothing. * * * I sneaked back to my car, which was parked at the front, got in my car and locked the doors and I was leaving. [Manfredi was also in the car.] I jumped across from that because they was throwing beer bottles and rocks and they hit my car and I left. This is when I stopped to talk to the police. * * * I told him that I had had some trouble down the club; a guy had beat me and called me a whole lot of names and whatnot, and * * * he didn't do nothing to assist me. [After taking Manfredi home,] I

went to my house, got my gun and I came back and I shot him." [2]

White did not testify, nor did he present evidence at trial. At the close of evidence the jury returned a verdict finding White guilty of murder in the second degree.

White raises three issues in his appeal. He alleges that the trial justice erred in restricting defense counsel's cross-examination of a police officer testifying at trial, thus violating his state and federal constitutional rights to confrontation. He also argues that the prosecutor's remarks during final argument implied that defendant had a burden to produce witnesses and that such statements require a reversal of the conviction. Finally, White contends that his privilege against self-incrimination was violated when the trial justice admitted his statements to the police into evidence.

Cranston police officer Raymond Wilbur testified for the state. He was the first police officer to arrive at the scene of the murder. Wilbur testified that he had been to Buck's Lounge on several prior occasions on routine stops to be sure that the bar closed on time. On cross-examination, Wilbur was asked how many people, of the fifty to seventy present, were black. He responded that he did not remember. Defense counsel then inquired whether he had ever seen any black people at Buck's Lounge when he had been there before. The state's objection to the question was sustained.

The defendant's purpose in attempting to explore this area was to "make the jury aware of the racial overtones of the entire incident—namely, that Buck's Lounge was a country-western bar with an exclusively white clientele—in order to reveal the volatile atmosphere that must have existed when Alfred White, a black man, walked in with a white woman." The defendant also claims that this evidence would have helped him to establish that he was laboring under the heat of passion when he shot Walters.

The scope of cross-examination is a matter addressed to the sound discretion of the trial justice. *State v. Plunkett*, 497 A.2d 725 (R.I.1985); *State v. Anthony*, 422 A.2d 921 (R.I.1980). The discretion to limit the scope of cross-examination is of course limited by the defendant's state and federal constitutional rights to confront and cross-examine witnesses. *State v. Plunkett*, 497 A.2d at 728; *State v. Beaumier*, 480 A.2d 1367 (R.I.1984). If, however, adequate opportunity has been provided to confront and cross-examine the witnesses testifying against the defendant, the trial justice's ruling to permit or limit cross-examination will not be disturbed unless there has been an abuse of discretion. *Id.*

The defendant cites a number of our decisions in which the limitation of cross-examination was held to be reversible error. *See State v. Plunkett*, 497 A.2d 725 (R.I.1985); *State v. Beaumier*, 480 A.2d 1367 (R.I.1984); *State v. Parillo*, 480 A.2d 1349 (R.I.1984); *State v. Freeman*, 473 A.2d 1149 (R.I.1984); *State v. DeBarros*, 441 A.2d 549 (R.I.1982). These cases, however, are distinguishable from this case in several important respects. *Parillo* and *Freeman* both involved instances in which the defense was not permitted to explore the sole eyewitness's potential motive for testifying. In *DeBarros* the defendant attempted to show that the state's chief witness had an interest in litigation that would reflect on his motive for testifying. In *Beaumier* the defense was not allowed to cross-examine the police officer who provided testimony that was the only link between the defendant and the crime, who was himself under investigation for theft, and who might have fabricated his story in order to ingratiate himself with his superiors.

None of those circumstances were present in this case. Officer Wilbur could hardly be characterized as a key witness in

---

2. An investigation revealed that White had approached a police officer named Maloney for help. *Evidently the police officer was unable or unwilling to help.* As a result White resorted to his own devices, and what may have been an opportunity to diffuse the situation was irretrievably lost.

the state's case. Although a witness's motive for testifying, bias, and veracity are always subject to exploration on cross-examination, Wilbur's testimony was not meaningfully attacked on those grounds. Wilbur was simply the first to respond to the crime scene. His motive, bias, or veracity was not material to defendant's theory of the case. Had they been at issue and had defendant's cross-examination respecting them been limited, we might well be more receptive to his assertion that an error of constitutional magnitude occurred. The cross-examination at issue, however, was designed to establish the racial composition of the crowd on the night of the shooting and on other unspecified nights. Wilbur said that he could not remember whether there had been any other black persons there that night. Although the racial composition of the crowd on March 7 was arguably relevant to re-create the atmosphere in the bar on the night of the murder, the question of whether black people had been in the bar in the past was simply not material to the atmosphere in the bar on March 7.

More importantly, we note that defendant was able to show that he probably was the only black person in the bar that night through Sheila Hemelgarn. She was a witness who was certainly more competent to establish that fact because she was present in the bar before defendant arrived the first time that evening and she remained there until after the murder.

Our reading of the record reveals that defendant was very successful in keeping the aura of racial bigotry surrounding the murder ever before the jury; the state never seriously challenged this aspect of the events. We find that defendant was afforded full and effective cross-examination of the witness and that the value of the desired inquiry would have been merely cumulative on a well-established fact. The trial justice did not abuse his discretion in limiting the scope of the cross-examination, and we shall not disturb his ruling on the matter.

■ During final argument, defense counsel argued that the jury could have a reasonable doubt about the guilt of defendant because the state had not presented several witnesses whose names were mentioned during the trial. This lack of evidence was allegedly fatal to the state's case.

"Defense Counsel: It's not our obligation to present any witnesses. It's the State's obligation * * *. Out of the fifty to a hundred people that were in that lounge that night, how many did they present? * * * Where are the La-Fonds? Where are the St. Jeans? Where is Earl Pepper? * * * Where is Officer Maloney? * * * Where were the LaFonds? Where is Carolyn Manfredi? You can have a reasonable doubt from the lack of evidence. * * * Where are the fifty to seventy people who were in that lounge other than Hemelgarn and Jay Barry Robinson? * * * Why haven't you heard from Maloney?"

In his closing argument the prosecutor responded to that argument, and the following colloquy took place.

"Prosecutor: You didn't hear from Carolyn Manfredi, that's true. What do you know about her? Girl friend of this Defendant. What would you expect her to say? * * * You heard testimony about the LaFonds. What testimony did you hear? They were riding with this Defendant. They were friends of the Defendant.

*　　*　　*　　*　　*　　*

You're not here to decide anything about the Lafonds. You are here to decide two things: did he pull the trigger of the shotgun? Yes, he did. When did he decide to use it? When he loaded it. When he put a shell in his pocket."

The defendant objected to the prosecutor's argument, but the trial justice ruled that it was "fair comment in view of the arguments made."

The defendant asserts that these statements by the prosecutor were impermissi-

ble comments on his failure to present witnesses. Furthermore, the remarks probably provoked the jury to speculate improperly about defendant's silence and his failure to present witnesses.

We have been careful in the past to disapprove, in the strongest terms, of prosecutorial comment upon a defendant's failure to call witnesses. *State v. Taylor,* 425 A.2d 1231 (R.I.1981); *see State v. Forrest,* No. 80–547–C.A. (order filed December 18, 1981). In *Forrest* we reversed the conviction, because "counsel for the state improperly commented to the jury in final argument upon the failure of the defendant to present certain witnesses in support of his assertion of self-defense. * * * The cautionary instruction given by the trial justice failed to meet the standards" set forth in *State v. Taylor* and were inadequate to cure the prejudicial effect of the improper comment. *Id.* Nonetheless, the state urges this court to find, as the trial justice did, that the prosecutor's statements constituted fair comment in light of defense counsel's argument to the jury. We decline to go that far. We continue to adhere to the view that prosecutorial comment on a defendant's failure to call witnesses is improper, even in these circumstances. We observe, however, that defendant never requested a *Taylor* cautionary instruction to cure the error. *Taylor* involved improper prosecutorial statements, and we outlined the requirements for effective and immediate cautionary instructions.

> "[T]he cautionary instruction must (1) identify the prosecutor's conduct as improper, (2) unequivocally indicate that the jury must disregard it, and (3) unequivocally indicate that since the defendant has no duty to present witnesses or any other evidence, his failure to do so cannot be construed as an admission that the evidence, if produced, would have been adverse." *State v. Taylor,* 425 A.2d at 1235.

The defendant's failure to request an immediate curative instruction that would have clarified matters for the jury is fatal to his argument on appeal.[3] *State v. Anil,* 417 A.2d 1367 (R.I.1980).

Finally, defendant asserts that the trial justice erred in finding that defendant knowingly and intelligently waived his privilege against self-incrimination when he confessed to the Cranston police. Consequently, the admission of the statements in evidence constituted prejudicial error requiring reversal of the conviction.

At the hearing on the motion to suppress the confessions and at trial, Sergeant Vincent McAteer of the Cranston police testified that he and another officer transported White from Providence to Cranston on the night of the murder. McAteer testified that he informed White of his *Miranda* rights in the car on the way to Cranston. McAteer stated that he told White that he had the right to remain silent, that he did not have to answer any questions or give a statement, that anything he said would be used against him in court, and that if White could not afford an attorney, one would be appointed for him. McAteer then asked White whether he understood these rights. White replied in the affirmative. McAteer then said to White, "Why don't you tell me what happened tonight?" at which point defendant gave McAteer a detailed account of the murder. After again being advised of his rights, White repeated the confession into a tape recorder and executed a written statement at the Cranston police station.

White does not allege that he was not advised of his rights or that McAteer's testimony was inaccurate. Instead, White asserts that McAteer and the officers at the station, in addition to asking him whether he understood these rights, should have asked him whether he wanted to waive those rights. He contends that this question had to be asked and assented to in

---

**3.** We note in passing that the trial justice's instructions to the jury at the end of the trial correctly and thoroughly indicated that the burdens of presentation and proof properly lie upon the state, not defendant, and that the presumption of innocence remains with defendant.

order for his statements to have been voluntary.

Under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), no statement obtained under custodial interrogation may be admitted against an accused unless the prosecution proves that the suspect has knowingly and intelligently waived his rights before making the statement. The prosecution bears the heavy burden of proving by clear and convincing evidence that the confession was voluntarily and intelligently given, and was not illegally obtained. *State v. Benton,* 413 A.2d 104 (R.I.1980). This court will not disturb the trial justice's ruling on the waiver question after a suppression hearing out of the presence of the jury unless our independent examination of the record, viewed in the light most favorable to the state, reveals that the ruling was clearly erroneous. *State v. Fuentes,* 433 A.2d 184 (R.I.1981); *State v. Proulx,* 419 A.2d 835 (R.I.1980).

After a review of the record in this case, we conclude that the defendant voluntarily and intelligently waived his privilege against self-incrimination. The defendant was read his rights when he was initially stopped by the Providence police. He made no statements at that time. He was later read his rights by McAteer, at which time after acknowledging that he understood them, the defendant confessed. When taken to the Cranston police station, White was again read his rights and signed a written rights-notification form. On this form White separately initialed each of his constitutional rights to show that he understood each one. There is nothing in the record to indicate that the defendant is unable to read or that he was physically or psychologically coerced into giving the statements. On the contrary, the defendant's rights were meticulously observed by the police. There is no requirement that the police, after ascertaining that a suspect understands his or her rights, must separately ask the suspect whether he or she desires to waive them before giving a statement. Having explored "the totality of the circumstances attending the accused's statement[s] to determine whether the accused did legitimately waive his constitutional rights," *State v. Proulx,* 419 A.2d at 839, we find that the defendant understood his rights and then chose to make a confession. We therefore uphold the trial justice's ruling that the statements be admitted into evidence.

For these reasons, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed and the papers of this case are remanded to the Superior Court.

BEVILACQUA, C.J., participated in the oral argument and in the decision of the court but retired prior to the publication of this opinion.